RAMSAY *against* ALLEGRE.

*Quære*, Whether a suit *in personam* in the Admiralty may be maintained against the owner of a ship by material men furnishing supplies for the ship in her home port, where the local law gives no specific lien upon the ship which can be enforced by a proceeding *in rem ?*

However this may be in general, such suit cannot be maintained where the owner has given a negotiable promissory note for the debt, which is not tendered to be given up, or actually surrendered, at the hearing.

APPEAL from the Circuit Court of Maryland.

This was a libel filed in the District Court by the appellant, Ramsey, against the respondent, Allegre, alleging that the appellant, at the special instance and request of the respondent, owner, ship's husband, or consignee of the schooner Dorothea, had performed various work and labour, and found and provided various materials for the use of the said schooner, to equip and prepare her for a voyage on the high seas, amounting to the sum of 2,428 dollars, 84 cents ; that the appellant had often applied to the respondent for payment, and been refused ; and praying process according to the course of the Admiralty, &c. A plea was filed by the respondent, alleging, among other things, that he had given the libellant his negotiable promissory note for the debt. It appeared, at the hearing, that the appellant had furnished the materials in question at the respondent's request. and

that the latter had given his negotiable promissory note for the same, which the appellant accepted, giving the following receipt therefor: " Received a note, at four months, which, when paid, will be in full for the above amount." The note not having been paid, this suit was brought. The District Court dismissed the libel, upon the ground, that the jurisdiction of that Court, as an Instance Court of Admiralty, in the cause, was waived by the acceptance of the promissory note; and the decree having been affirmed in the Circuit Court, upon the same ground, the cause was brought by appeal to this Court.

*Feb. 19th.*

The *Attorney General* and Mr. *Meredith*, for the appellant, argued, that the District Courts, proceeding as Courts of admiralty and maritime jurisdiction, might take cognizance of material suits by material men, either *in personam* or *in rem*.[a] The only question here was, whether the jurisdiction was waived by the appellant's taking the note as conditional payment. The note did not extinguish the debt, and, consequently, could not affect the jurisdiction which originally attached on account of the nature of the debt  Without some special agreement to consider the note as payment, it could not be so regarded. It only operated as a suspension of the remedy during the time allowed for its payment. If unpaid, the party might resort to his original right of action, as if no note had been given.[b] Such is the doctrine of the common law; and the civil law, which gave the rule to the admiralty, would be found in accordance. A *novation* is the substitution of a new for an old debt, by which the latter is extinguished. It may be made of a debt payable at a future day, or of a debt presently due, by a new engagement, allowing a term of credit. But the consent of the creditor must be positively declared, as the law will not presume that he means to abandon his rights under the first contract.[c] No authority or principle could be found to war-

*a* The General Smith. 4 *Wheat. Rep.* 438.
*b* Chitty on Bills, 5 ed. 103. 130. 6 *Cranch.* 253, 2 *H. Black.* 317. 5 *Term Rep.* 111. 1 *Evans' Pothier,* 286. (a.)
*c* Evans' Pothier, 380. 386.

rant the assertion, that, although the original contract in this case was not extinguished. the suspension of the right of action took away the jurisdiction of the admiralty, so that it could not again be resorted to.

1827.

Ramsay
v.
Allegre.

Mr. *Hoffman* and Mr. *Meyer*, contra, insisted, that the promissory note given in this case was a personal security taken on land, and in all respects assimilated the case to that of the claim for the master's wages.  Although, in general, locality might not be the test of admiralty jurisdiction, it might reasonably be contended that where the credit is personal, and the security of a kind exclusively cognizable at common law the locality should fix the jurisdiction.  In the case of contracts, the admiralty jurisdiction, *in personam*, ought to be merely co-extensive with the proceeding *in rem* : and as the domestic character of the vessel freed the thing from jurisdiction, the person of the owner ought also to be exonerated.[a]  As a security had been accepted, which had the effect of extinguishing a common law lien during the term of the note, no process could have been instituted in the admiralty on the original contract ; and the idea of reviving a jurisdiction, which had been thus suspended, was a novelty not countenanced by any legal analogy.  Supposing the jurisdiction of the Admiralty to be dependant upon the existence of a lien as defined by positive law, the authorities would show that such a lien was extinguished at common law by a new agreement.[b]  It had been expressly determined, that in cases of dealings or obligations, naturally within the appropriate jurisdiction of the Admiralty, if a special contract be entered into, or a special security be taken, the common law jurisdiction will attach as in ordinary cases, even though the new agreement does not operate technically by way of extinguishment.[c]

Mr. Chief Justice MARSHALL delivered the opinion of the Court : that. as it did not appear by the record, that the note had been tendered to be given up, or actually surren-

*March 2d.*

a  *4 Wheat Rep.* 438.

b  *Yelv.* 66.  *Selw. N. P.* 1163.  3 *Burr.* 1498.

c  *4 Burr.* 1950.  1 *Peters' Ad. Dec.* 238.  6 *Term Rep.* 320.  2 *Bro. Civ. and Adm. Law,* 88. 97.  1 *Salk.* 31.

dered, at the hearing in the Court below, the decree would be affirmed, it not being necessary to consider the general question of jurisdiction.

Mr. Justice JOHNSON. I concur with my brethren in sustaining the decree below, but cannot consent to place my decision upon the ground on which they have placed theirs I think it high time to check this silent and stealing progress of the Admiralty in acquiring jurisdiction to which it has no pretensions. Unfounded doctrines ought at once to be met and put down; and dicta, as well as decisions, that cannot bear examination, ought not to be evaded and permitted to remain on the books to be commented upon, and acquiesced in, by Courts of justice, or to be read and respected by those whose opinions are to be formed upon books. It affords facilities for giving an undue bias to public opinion, and, I will add, of interpolating doctrines which belong not to the law.

There need be no stronger illustration given than this case affords. Here is a libel, *in personam*, on a contract, in the Admiralty filed expressly upon the authority of the case of *The General Smith.* I had never read the report of that case, that I recollect, until the argument in this cause; or, if I had, I attached so little importance to any thing in it besides the point that it decides, as to have forgotten that such doctrines were to be found in the reports of our decisions. But, upon being examined, what does it amount to? A gentleman of the bar, whose knowledge, particularly in the Admiralty, commanded the highest respect in this Court, is reported to have laid down a doctrine in very explicit terms, which, I will venture to say, has no authority in law; and the Court, carried away probably by the influence of his concessions, echoes them in terms which are not only not called for by the case, but actually, as I conceive, contradicted by the decision which is rendered.

The correctness of the decision in the case of *The General Smith,* cannot be questioned; it dismisses the libel upon the ground, " that material men and mechanics, furnishing repairs to a domestic ship, have no particular lien upon the ship itself for the recovery of their demands."

But why have they no lien upon the ship ? or, to speak more correctly, why are they precluded from a remedy in the Admiralty for subjecting the ship to arrest and sale in order to satisfy their demands ? It is because jurisdiction over the contract has been taken from the Courts of Admiralty, and the exercise of jurisdiction, in such a case, prohibited to them by the common law Courts of Great Britain for hundreds of years. And it is a fact of the most positive certainty and notoriety. that so far from retaining jurisdiction over this contract *in personam*, after being driven from jurisdiction *in rem*, that the former was first surrendered, and that in the most unequivocal terms.

I refer to the resolutions of February, 1632, adopted by the King in council, and subscribed by all the judges in England, and to be found in the collection of the sea laws, and in various other books ; by the second section of the second article of which it is declared; that " if suit be in the Court of Admiralty for building, or mending, saving, or necessary victualing of a ship. *against the ship itself. and not against any party by name*, but such as for his interest makes himself party, (i. e. a claimant,) no prohibition is to be granted, though this be done within the realm."

This resolution implies an express recognition, that if such suit be instituted against *the person*, a prohibition shall issue. And this I hold to be the test of admiralty jurisdiction ; for wherever a prohibition will issue, the jurisdiction has been taken away from the admiralty. or it never possessed it. And, accordingly, for two hundred years has this jurisdiction been abandoned by the British Courts, with the single exception of seamen's wages ; an exception, of which it may emphatically be said, " *probat regulam.*" For, if any one will take the trouble to refer to the language of Ch. J. Holt, in the case of *Clay* v *Snelgrave*, he will there find it said, " that it is an indulgence that the Courts at Westminster permit mariners to sue for their wages in the Admiralty Court, because they may all join in suit. and is grounded upon the principle, that ' *communis error facit jus.*' " (*Lord Raym. 576.*)

This privilege is denied to the master, and even to a mate succeeding to the master, when he sues for his wages as

master; so rigid are the Courts of Westminster in confining the admiralty to the few contracts over which it is permitted to retain jurisdiction. And when it is argued, that this discrimination to the prejudice of the master, is confined to his suit *in rem*, and that no case can be found in which his remedy *in personam*, in the admiralty, has been denied him, it becomes necessary to remind counsel, that this may have proceeded from no one's ever having had the temerity to prefer such a suit—a consequence which would necessarily follow from what I hold to be undeniable, that, except on the contract for seamen's wages, *the proceeding in personam upon contracts* is now unknown to the British admiralty tribunals.

I will sketch a brief history of the admiralty jurisdiction over contracts, and a view of its present state.

The study of the history of the admiralty jurisdiction in England, in common with that of all the Courts of that kingdom, except the common law Courts, presents an instructive lesson on the necessity of watching the advancement of judicial power, in common with all power; inasmuch as it shows in what small beginnings, and by what indirect and covert means, aided by perseverance and ingenuity, originated the mighty structures against which, ultimately, the legislative and judicial power of the country had to exert the full force of their united efforts.

The vast variety and importance of the subjects which the admiralty had appropriated to itself, will appear in a variety of authors; but I would refer the reader to *Godolphin's " View of the Admiral Jurisdiction,"* as well for its antiquity as the great learning and respectability of the author. There, it will be seen, that the admiralty, before the time of Richard II. had arrogated to itself a scope of judicial, legislative, and ministerial power, which withdrew from the trial by jury, and placed under the surveillance of the crown, of which the admiralty was only the representative, more than half the jurisprudence, and particularly the commercial jurisprudence of the kingdom.

The statutes of 13th and 15th Richard II. were passed to set limits to this power, but such was the stability it had already acquired, that it was not until the act of 2 Henry IV

c. 11 which gave to the subject exactly the right which the constitution of the United States gives to its citizens, against unconstitutional laws, was passed, that this overgrown power could be effectually restrained. For it could then no longer prescribe its own limits in prejudice of the individual and to the exclusion of his common law rights. Neither the King nor his proctor could any longer justify or secure the individual who resorted to the Admiralty in a case in which the common law could give redress. (3 *Levinz.* 353.)

· The act of 13 Richard says, upon complaint of encroachments made by the admirals and their deputies, it is enacted, " that the admirals and their deputies shall meddle with nothing done within the realm, but only with things done upon the sea;" and the 15th Richard, c. 3. " that in all contracts, pleas, and quarrels, and other things done within the bodies of counties, by land or water, the admiral shall have no cognizance, but they shall be tried by the law of the land." And the 2d Henry IV. c. 11. provides, " that he that finds himself aggrieved against the form of the statutes of Richard, shall have his action by writ grounded upon the case against him that so pursues in the Admiralty, and recover double damages."

The check given by legislative provision was followed up by prohibitions from the common law Courts, and suits under the statute of Henry, until, upon the murmurs of the Lord High Admiral at the checks imposed upon his power, the subject was taken up by the King in council in 1632, and a kind of compromise entered into, to which all the different tribunals appear to have at first conformed; but in which, after a time, the common law judges appear to have discovered, that the crown and the Admiralty had gained too decided an advantage over them to admit of its being adhered to as a correct exposition of the statutes of Richard. Hence, in the 3d edition of *Croke's Reports*, at the end of the 2d volume, we find these resolutions declared to be of no authority, as undoubtedly they were not, since it was not a regular judicial act. But in this, it must be noticed, that the authority denied to those resolutions was not on the sub-

1827.

Ramsay
v.
Allegre.

ject of those powers which the Admiralty renounced, but of those which they retained.

Upon this ground, it is well known, that those resolutions, although printed in the 1st and 2d editions of *Croke's Reports*, were omitted from the 3d. The mantissa at the end of the edition of 1767, declares their rejection as authority. But, even before the adoption of those resolutions, a decision had taken place, which was conclusive, as well against their jurisdiction over the particular contract here under consideration, as against their right of proceeding upon it by process *in personam*.

I allude to *Craddock's case*, (2 *Brownl.* 37.) which was decided in the 7th of James, or in the year 1608, twenty-four years before the date of these resolutions. This was distinctly the case of a material man; his purchases were of cordage, powder, and shot, for a ship, and the party of whom they were bought sued Craddock in the Court of Admiralty. A prohibition was granted, and the reason assigned by the Court is, that the statute 13 Richard II. " that the admiral shall not meddle with things made within the realm, but only of things made upon the sea, and here the contract was at St. Katharine's Stairs, in the body of a county." And thus we see, that in the resolutions alluded to, the claim to jurisdiction *in personam*, denied the Admiralty by the effect of that adjudication, is abandoned by them; at the same time that they assert the right to exercise jurisdiction *in rem* upon the same class of contracts. It was not long after, however, that the exercise of jurisdiction *in rem* was also taken from them. And yet there is a semblance of authority for their having exercised it during the interval of time between the adoption of the resolutions of 1632, and when they were declared to be of no authority. I allude to that quotation from 1 *Rolle's Abr.* 533. which is copied into *Bacon's Abridgment*, p. 196. of the 1st vol. and there, together with the note which refers to *Cro. Charles*, 296. has remained the permanent source of many an error to those who have not taken the trouble to examine into the authority for the law there laid down.

This subject will be found learnedly examined in the cases of *Clinton* v. *The brig Hannah and ship General Knox*, de-

cided in the Admiralty by Judge Hopkinson, of Pennsylvania, in the year 1781 ; and by Judge Bee in the Admiralty of South Carolina, in the case of *Shrewsbury* v. *The sloop Two Friends*, in 1786 ; in both which cases the authority of those quotations is rejected, and the lien of the shipwright to sue *in rem* in the Admiralty denied. (*Bee's Adm. Rep.* 419. 433.)

Both those cases go to show the law of this subject at the adoption of our constitution, and they merit high respect, both for the known abilities of the judges who pronounced them, and the intrinsic learning they display. They show plainly, that the quotations mentioned rest altogether on the authority of the resolutions of 1632, to which certainly no lawyer will attribute authority any farther than they go to show, that the Admiralty did not even then pretend to the jurisdiction *in personam* upon contracts at all, and upon very few even *in rem*.

It may seem surprising, that from the time of Richard the Second down to the beginning of the 17th century, the jurisdiction of the Admiralty Court should have attracted so little of the attention of the common law Courts. One principal cause will be found in the civil wars, and the low state of commerce ; and when the nation returned to a state of tranquillity, the power and vigour of her monarchs left little scope for legislative or judicial action. Yet there are cases to show, that the subject was not forgotten ; and when the increase of commerce, and the weak reign of the Stewarts, presented a motive and an opportunity, that the attention of the nation was attracted to the usurpations and unconstitutional power exercised by that Court.

It is obvious, also, from the cases and discussions of that day, that the common law Courts were embarrassed by a technical difficulty, arising out of the necessity of laying a venue to every action. As soon as this was removed, (and the advocates of the Admiralty murmur very much at the supposed absurdity of removing this absurdity,) the progress of the common law Courts was rapid in wresting from the Admiralty every species of contract, leaving them none to act upon, on which they could themselves render complete justice according to the established rights of the par-

ties.    They are charged with absurdity and inconsistency, but I pronounce the charge utterly groundless; for the one principle runs through all their decisions, that of subjecting to the trial by jury every cause in which that form of trial could be applied without injury to the parties' rights.    It is true, that where they found them in the exercise of a power analogous to that of a Court of equity, they did not take from the Admiralty a power which they should only have handed over to another civil law Court; they had no motive, if they had the power, to make the transfer.    And hence the Admiralty is left in the exercise of jurisdiction in cases of hypothecation, bottomry, and a kind of specific execution between part owners of ships.    Their jurisdiction of prize and salvage are royalties, and that over seamen's wages is a peculiarity, but perfectly reasonable and consistent, in whatever light it be viewed.    In the sea laws it is called " a custom of the realm."    Ch. J. Holt, we have seen. puts it on the ground of a positive concession and *communis error*. And the judges often say, " *we permit* them to exercise this jurisdiction, because they may sue together there. and must sue severally in the common law Courts, and there they can have remedy upon the body of the vessel, which they cannot have here ;" thus placing the exception in their favour upon the conceded ground of incapacity in the common law Courts to do complete justice, and the equitable ground of preventing a multiplicity of suits.

My own opinion is, that it stands on a much higher ground, and has its basis in the same policy which makes their wages to depend on the safety of the ship they navigate, by giving them, in that event, every possible chance of getting compensated.    To which we may add, that their thoughtless character and ignorance renders them emphatically the wards of the Admiralty. while the law on which they earn or lose their wages is a system of the Admiralty.    The assertion of the general principle against the captain's contract, finds its solution in his right to receive the freight in preference even to his owner, and thus to pay himself; and in the perfect competence of the common law Courts to do justice in his contract with the owner.    In the case of ransom, he still may resort to the Admiralty, and proceed *in rem*.

1827.

Ramsay
v
Allegre.

But, right or wrong, it is not to be questioned at this day, that the Admiralty have lost their jurisdiction over contracts, with the exceptions stated. The most animated advocates of the Admiralty do not deny this. They mourn bitterly over its fall, but uniformly acknowledge that they are eulogizing the dead. In *Godolphin*, Sir *Leoline Jenkins' Works*, and the collection of the *Sea Laws*, will be found all in substance that ever was said on this subject. Yet they all unequivocally acknowledge that its jurisdiction has long since been at an end over contracts, and *in personam*, with the exceptions I have stated; while they dwell eloquently on the folly of plucking this " diamond from the crown;" and enlarge greatly on the inconvenience of leaving to a jury the decision of causes which could be so much more advantageously disposed of by a single Judge, and by a system of laws peculiar to the Admiralty Courts; and arraign with severity the inconsistencies, absurdities, and unkindly feelings, with which the common law Courts have stripped the Admiralty of its ancient and eminent power. Even *Brown*, the modern champion in Europe of the Admiralty jurisdiction, but who obviously has only caught the feelings, and borrowed the arguments of those who have gone before him, is forced reluctantly to acknowledge that the Admiralty has for ages been stripped of these powers, though he would spare no effort to restore them if he could. (See Appendix to his 2d vol. and note at the end, said to be omitted at p. 100.)

It has sometimes been contended that the decisions of the common law Courts, as exemplified by their granting prohibitions, is not conclusive against the Admiralty jurisdiction—that it is a disputed jurisdiction, and therefore that the Admiralty judges themselves should be heard in this " *Litis Contestatio.*"

But this is obviously incorrect; for the Court of King's Bench, by its acknowledged jurisdiction, as exemplified in the very exercise of its power to prohibit, is the very source to which we are to look for lights to determine the respective powers of the inferior Courts. And the decisions that have taken place on this subject, are nothing less than judicial expositions of the statutes which limit the powers of the Admiralty. They amount to the construction and applica-

tion of the law of the realm, of the statute law, and are therefore conclusive. So every lawyer knows they are held to be in the British Courts; and together, they make up that system of law which, by universal consent, was adopted in the Admiralty Courts in this country before the revolution, at least on the subject of jurisdiction over contracts, and *in personam.* I will now take a brief view of some of the leading decisions, in England and in this country, on the subject of contracts.

The quotations I shall first make have two objects in view; first, to show that the particular contracts under consideration, to wit, of material men, have been denied to their jurisdiction; and secondly, that, in every instance in which they have been prohibited from the exercise of jurisdiction over contracts, it has been upon a ground that is fatal to the exercise of jurisdiction in this and similar causes.

On this latter subject it would be unnecessary to search further than that article in the *4th Inst.* (138. 141.) in which Sir Edward Coke gives a detailed account of his own answers to the complaints of the Lord High Admiral to the King, against the restraints then recently imposed by the common law Courts upon his jurisdiction. This was early in the reign of James the First; and notwithstanding the revival of the clamours against that learned judge on the same subject, I cannot but express the opinion that it is a calm, dignified, learned, and triumphant answer. The authorities which he cites are valuable for their antiquity, as they show that the Courts in his time were only treading in the steps of those who had preceded them.

Thus, to prove that charter parties were without their jurisdiction, he cites *Hare* v. *Unton,* (31 *Hen. VI.*) and observes that there were an infinity of cases to the same point.

To prove that policies of insurance were not of Admiralty jurisdiction, he cites *Crane & Pell,* (38 *Hen. VIII.*)

To prove that maritime contracts, notwithstanding a *foreign* origin, are not to be taken from the common law Courts, he cites 28th, 39th, and 40th *Eliz.*

And finally, it is important to advert to the manner in which he explains the rule by which it is to be determined whether any given contract is or is not of Admiralty juris-

diction; which is no other than by showing from adjudged cases, that the common law Courts have exercised and can exercise jurisdiction over the same contract. (p. 141.)

Sir Matthew Hale, in his History of the Common Law, when sketching the jurisdiction of the Admiralty, says, " the jurisdiction of the Admiral Court, as to the matter of it, is confined by the laws of this realm to things done upon the high sea only ; as depredations and piracies *upon the high sea ;* offences of masters and mariners *upon the high sea ;* maritime contracts *made and to be executed upon the high sea ;* matters of prize and reprisal *upon the high sea.* But touching *contracts* or things made *within the bodies of English counties,* or upon the land beyond the sea, though the execution thereof be in some measure upon the high sea, *as charter parties,* or contracts made even upon the high sea, touching things that are not in their connexion maritime, as a bond or contract for payment of money, &c. these things belong not to the Admiral's jurisdiction. And thus the common law and the statutes of 13 Rich. 2. chap. 15. 15 Rich. 2. chap. 3. confine and limit their jurisdiction to matters maritime, and such only as are done upon the high sea." (Chap. 2. p. 35.)

I have before cited the case of *Craddock,* from *Brownlow,* to show how early the Admiralty was prohibited from exercising jurisdiction, and that *in personam,* on the contracts of material men. In a note to *Abbot on Shipping,* (page 136.) it is asserted that the same is reported in *Owen,* under the title *Leigh* against *Burleigh.* But I think it clearly a distinct case, as not only the parties but the facts are different ; (*Owen,* 122.) but the principle of the decision is the same.

In *Sheppard's Abridgment,* (vol. 1. p. 125.) is to be found an excellent summary of the ancient Admiralty law ; and one article merits notice, as it serves very distinctly to show the true origin of the articles in *Rolle* and *Bacon's Abridgment,* which have been so often relied upon as authority for a contrary doctrine. He quotes 3 *Cro.* 296, 297. for the following doctrine, " that a suit may be in the Admiralty Court for building, saving, amending and victualling of a ship against the ship itself, *not against the party, but such as make themselves for their interest parties.*" This is the very lan-

1827.

Ramsay
v.
Allegre.

guage of the resolutions of 1632, and those are the pages in which they were inserted in the two first editions of Croke, before they were exploded.

Sir Leoline Jenkins, whose authority certainly no advocate of the Admiralty will deny, acknowledges, in so many words, that the Admiralty could not exercise jurisdiction over the contracts of material men. (1 vol. 83.)

That the remedy against the ship itself, has long since been taken away, is established by many authorities. In the American edition of *Abbott on Shipping*, a work entitled to great respect, it is laid down, in very general terms, "that a shipwright, who has once parted with the possession of a ship, or has worked upon it without taking possession, and a tradesman who has provided ropes, sails, provisions, or other necessaries for a ship, are not, by the law of England, preferred to other creditors, nor have any particular claim or lien upon the ship itself for the recovery of their demands." (p. 135.)

That the author is here speaking of a " claim or lien" in the Admiralty, is fully established by reference to the cases which he cites and comments upon. The authorities he cites fully bear him out in his doctrine. They are chiefly *Hoare* v. *Clement*, 2 *Show.* *Justen* v. *Ballam*, 2 *Lord Raym.* 805. *Watkinson* v. *Barnardiston*, 2 *P. Wms.* 367. And numerous other cases might be cited, both ancient and modern, to the same effect, upon which the doctrine seems fully established in England, that neither shipwrights nor material men can sue in the Admiralty, either *in personam* or *in rem*, without express hypothecation, and all assigning the universal reason, that they have the common law Courts open to them. (See also *Bushnel* v. *Suel*, 1 *Vesey*, 155.)

Some of those loose *obiter dicta* in which the most eminent and prudent judges sometimes indulge, have been attributed to an eminent English jurist, which have been thought to cast some doubt upon these doctrines in modern times. The facts stand thus : in the 17th Geo. III. Lord Mansfield is reported to have said, in the case of *Rich* v. *Coe*, (*Cowp.* 636.) " that a person who supplies a ship with necessaries, has not only the personal security of the master and owner, but also the security of the specific ship." And, again,

nine years after, he is reported to have repeated the same *dictum* in the case of *Farmer* v. *Davis*, (1 *Term Rep.* 108.) in both instances, however, mere gratis dicta with regard to the points decided.

But, in opposition to this, we have the expression of Lord Kenyon in the case of *Westerdell* v. *Dale*, which occurred eleven years after, in which he is reported to have said, that he doubted whether the doctrine had not been too generally laid down by Lord Mansfield, and referred to the authority of some of the old decisions, which establish the contrary doctrine. Indeed, when we refer to the language of Lord Mansfield himself, in the case of *Welkins* v. *Carmichael*, which occurred only two years after *Rich* v. *Coe*, it is difficult to imagine how the same judge could have held such inconsistent doctrines. For there (3 *Dougl.* 101.) he is reported to have decided, " that a carpenter, in parting with his possession, had lost his lien, if he ever had one;" " that creditors for stores and provisions had no lien," " and that work done for a ship in England is supposed to be on the personal credit of the employer, although, *in foreign ports, the master might hypothecate.*" This is all consistent with the established doctrines of the English Courts; and the truth is, that if this learned judge had had the subject fully before him, on a motion for a prohibition, he would never have confounded the law of other states, or other times, with the common law of England in his time. To do him justice, what he decides in the last case, should be received as what he meant in the two former.

In the third American edition of *Abbott on Shipping*, p. 160. I find a note in these words : " It does not appear, that it has ever been held in the Courts of the United States, that shipwrights and furnishers of supplies in the ports of the United States *have not* a lien on the ships, or a right to Admiralty process, to recover the amounts due them. The question has not, to my knowledge, arisen in the Supreme Court of the United States. But in the District Court of Maryland, after a *very learned* discussion, Winchester, Justice, decided, that a shipwright, by the maritime laws, has a lien on the ship for repairs done, and materials found by

1827.

Ramsay
v
Allegre.

1827.

Ramsay
v.
Allegre.

him while the ship is in a port of the United States. (*Stevens v. The ship Sandwich*, 1 *Peters' Rep.* 233. note.) The same opinion was given by Peters, Justice, in Pennsylvania, in *Gardner v. The ship New-Jersey*, 1 *Peters' Rep.* 223. (See also, 1 *Roll. Abr.* 533. l. 15. *Cro. Car.* 296.")

From this note it appears, that the learned editor, to whom, I presume, it is to be attributed, was not aware of the two decisions rendered by Judges Hopkinson and Bee, to which I have above alluded. Both of them will be found directly in point against the shipwright's lien, and the research and learning which they display will be found worthy of the high reputation of the judges who rendered them. These cases will also be found interesting, from the circumstance of their containing criticisms upon the authority of the law upon which both Judges Peters and Winchester appear to have been misled; I mean the standing quotation from 2 *Bacon*, with its usual accompaniments from *Roll.* and *Cr. Ch.* i. e. *Roll. Abr.* 533. and *Cro. Ch.* 296.

I cannot, however, admit, that the decision of Mr. Peters, in the case of the *New-Jersey*, is a case in point on the proposed subject. For the question of the lien of material men or shipwrights did not there arise. It is only mentioned arguendo, as an apology for making an allowance to the captain out of funds in the registry, for wages paid, and supplies furnished the vessel from his own funds. An allowance, which he at last excuses in a note, by saying, " that it was not opposed," and for which he might also have plead the high authority of the case of *Watkinson v. Barnardiston*, (2 *P. Wms.* 367.) in which the same thing was done, and that of *The John* (3 *Rob.* 288.) But the doctrine laid down as to material men and shipwrights by the learned judge, are gratis dicta, and, as is fully shown in the case of *The General Knox*, cannot be sustained by the authority quoted.

With regard to Judge Winchester's decision in the case of *The Sandwich*, it cannot be denied that it is directly in point. But, it is equally true, that it appeals to no authority that can sustain it. It is not by an exhibition of learning that decisions are to be tested, but by sound conclusions from unquestionable premises. To obstruct our inquiries by

1827.

Ramsay
v.
Allegre.

a battery of cases, or learned and remote quotations, often obtain from *faith* concessions that ought to be yielded only to *investigation.* I admit, that Judge Winchester's decision is characterised by learning, but certainly his premises cannot be conceded to him; they are founded in error. His course of reasoning is this:

" The constitution of the United States vests in the United States Admiralty and maritime jurisdiction, and that jurisdiction is vested in the District Court." " In England, (I now quote his words,) where the jealousy of the civil law was most conspicuous; while its authority was openly denied, the principles of equity derived from that code influenced the decisions of their Courts in as great a degree as in countries where it was adopted. In all of which, from the books within my power, I can obtain any legal information, every contest or dispute between the owners and mariners, and the owners and builders, or equippers of a ship for navigation on the sea, is of a maritime nature, and cognizable in the Admiralty." He then goes on to observe, " that the statutes of 13th and 15th Richard II. have received a construction which must, at all times, prohibit their extension to this country ;" and, finally, when he comes to state the proposition, " Has a shipwright a lien on the vessel by him repaired for the value of his materials, labour," &c. ? he says, " to decide this question, it is necessary to examine the nature of liens and privileged debts at the civil law ;" and, accordingly, he proceeds to examine what is the law of various countries of the continent, which are subject to the civil law, and concludes with adopting two propositions. thus : " I am, therefore, of opinion, that a ship-carpenter, by the maritime law, has a lien on the ship for repairs in port; and that the cause being a maritime cause, the Court has a jurisdiction over the person as well as over the ship." The authorities which he quotes are, *Zouch, Beawes, Valin, Rolle's Abr.* 533. and 1st *Bacon,* 178.

Now, learned as this decision may be, it is obvious that it is but a tissue of errors, since it adopts the civil law as its guide, and the Admiralty law, in the time of its most extravagant pretensions, positively denying the authority of

the statutes of Richard, and the modifications which they introduced into the law maritime.

The laws of the continent of Europe furnish no authority on this question. Every state has its own laws on these contracts, as have most of the States of this Union. The ordinance of Louis XIV. on which Valin comments, is the statute law of France, and expressly vests in its Courts maritime jurisdiction over a variety of contracts which the common law Court has taken from the jurisdiction of the Admiralty. The question is not what the civil law would give, but what remains to the Admiralty of that jurisdiction, which no one denies that it had assumed under the authority of civil law principles.

The laws of Oleron, which may be called the statute law of Great Britain in maritime affairs, and which I am pleased to find published in Mr. Peters' first volume, together with Postlethwaite's Commentaries, give none of these powers over contracts to the Admiralty.

I think it has been sufficiently shown, and, indeed, in denying authority to the British decisions under the statutes of Richard, Judge Winchester must be held to admit, that the British decisions are contrary to his decision on the lien of the shipwright.

Mr. *Brown*, (in his 2d vol. p. 80, 81.) distinctly acknowledges it to be settled, "that no person can sue in the Admiralty for work and labour done in the port before the voyage begins, or necessaries sold for the ship's use before she sails, nor even where supplied to a foreign ship lying in a British port." Where money is lying in the registry, as in the case decided by Judge Peters, there has been a disposition manifested recently, to get over the rigid rule, if there could be found an excuse for it; but none yet, I believe, has been found, except for money actually expended by the captain, and for which he might have hypothecated. There, perhaps, it may be considered as a *quasi* hypothecation. (3 *Term Rep.* 323. 2 *P. Wms.* 367. 2 *Rob.*)

I will now show that Judge Winchester is equally unsustained in his other principle, to wit, that "on a maritime contract, as a general proposition, the Court of Admiralty has jurisdiction over the person as well as over the ship."

I will not refer to the instance of bottomry by the master, because I do not believe that he had in mind that case, but will confine myself to the distinct proposition, "that in no case of contracts, except that of seamen's wages, can the Admiralty proceed *in personam*," which is the point now before this Court.

I have referred to the celebrated resolutions of 1632, in which, when the Admiralty were solemnly gathering up and consecrating, as they thought, the remains of their jurisdiction, this right is, in express terms, relinquished; to Sheppard's Abridgment, in which, at a period long subsequent, such is given as the purport and exposition of that document; and I have quoted Craddock's case, and Leigh and Burleigh's case, in which the Court of Admiralty was expressly prohibited from proceeding *in personam* in behalf of material men. I should think here I have a right to demand, if from the whole library of law books, and God knows we have enough of them already, "camel loads," a single attempt to proceed *in personam*, upon a contract in the Admiralty, except for seamen's wages, since the date of the resolutions of 1682, can be extracted. Adjudged cases cannot be found, because, since the antique cases to which I have referred, the right has been abandoned. *Dicta* enough can be produced, and some of those very modern.

*Godbolt* speaks of the process *in rem*, as the only process issuable in the first instance from the Admiralty, (260.)

In the edition of *Abbott*, which I have quoted, in a note upon the case of *Hoare* v. *Clement*, (p. 136.) a case arising on a contract for necessaries, it is admitted, "that the Court of Admiralty had no jurisdiction over the person in that case."

In *Johnson* v. *Shippen*, (2 *Salk.* 983.) in which a libel was filed against ship and owners, on an hypothecation for money borrowed abroad on her voyage, it was argued that, if suit lay against the owners at all, it lay at common law, and a prohibition was granted as to the suit against the owners, but refused as to the vessel.

In *Bull* v. *Trelawney*, (16 *Ch.* 1.) Trelawney had sued in the Admiralty on a foreign contract, *in personam*; obtained judgment, and Bull was in gaol. The latter brought his ac-

1827.

Ramsay
v.
Allegre.

tion under the stat. 2 *Hen. VI.* c. 11. recovered double damages, and was discharged on habeas corpus, on the ground of being in confinement in a cause " *coram non judice.*" (*Cro. Ch.* 603. and 3 *Lord Raym.* 982.)

*Brown*, (2 vol. 100.) lays down the rule in these terms: " The general rule, however, at present, is, that the Admiralty acts only *in rem*, and that no person can be subject to that jurisdiction but by his consent, expressed by his entering into a stipulation."

And even this mode of subjecting the person, through the medium of a stipulation, it is well known, was itself resisted at first, and acquiesced in only on the ground of its being an indispensable incident to the. exercise of the jurisdiction *in rem.*

In *Keble's Reports*, (p. 500.) quoted by *Brown*, it is expressly said, " that without a stipulation, the Admiralty has no jurisdiction at all over the person."

In the case of *Ousten* v. *Hebden*, (1 *Wils.* 101.) where one libelled in the Admiralty, to compel his part owner in a ship to join in a sale, a prohibition was granted, upon the ground that this was in fact an attempt to exercise a jurisdiction *in personam.*

There is a class of cases which may appear, at first view, to maintain a contrary doctrine, but which, upon examination, will be found consistent with the general principle.

The case of *Manro* v. *Almeida*, decided in this Court, was one of that description. They are cases in which the Admiralty proceeds *quasi in rem*, when the subject of the suit is withdrawn from its jurisdiction. These cases proceed upon the supposed contempt in withdrawing the *res subjecta* from the process *in rem*. This was the case of *Smart* v. *Wolf*, (3 *Term Rep.* 323.) in which the prize Court had improvidently ordered the cargo of the captured vessel to be delivered to the captors, reserving the question of freight, but without taking a stipulation bond, in a sum equal to what afterwards appeared due for freight. A monition from the Admiralty was sued out to the captor's agent, to respond to the captain's demand for freight, to the full amount decreed to him; and against this proceeding, the Court of King's Bench refused a prohibition.

Here the prize Court acted upon a *quasi* hypothecation of the goods for the freight, resulting from their reserving the question of freight; and considered the captors in the light either of their own bailee of the goods, or in his original relation of captor, against whom, if the goods are not returned on monition, the Court proceeds as on contempt.

In *Manro* v. *Almeida*, (10 *Wheat. Rep.* 472.) the libellant claimed redress against a foreign captor, in a cause peculiarly of Admiralty jurisdiction. The captain of a foreign privateer had, on the ocean, seized a sum of money in dollars, the property of the libellant, which the libellant alleged had been piratically taken; and finding property of the captor here, sued out process against the captor for the purpose of examining before the Admiralty the correctness of the seizure, and obtaining indemnity for it. The principal question considered in that case, arose on the form of proceeding; but the object was the prosecution of a suit *in rem*, to wit, to obtain restitution of the $5,000 seized by Almeida on the ocean, as prize.

A case very similar to this is to be found in a note to the case of *Smart* v. *Wolf*, in which the Admiralty proceeded against the agents of a captor to subject to its jurisdiction a sum of money that had been taken out of a prize, and passed into account between the agent and his principal.

On the cases of this class, two remarks will always hold good. 1st, They are instances in which the Court of Admiralty had jurisdiction of the principal question, not contracts, but maritime torts and prize causes, or their incidents; and, 2dly, that the process *in personam* is only the means to get possession of the *res subjecta*; that is, of exercising an unquestionable jurisdiction *in rem*.

We sometimes hear of a concurrent jurisdiction between the Admiralty and common law Courts. But, on the subject of contracts, which is the subject now under consideration, I deny that, with the exception of seamen's wages, any such concurrent jurisdiction can exist. It is an absurdity in terms, for the rule which goes through all the cases, is in direct hostility with it. If the common law can try the cause, and give full redress, that alone takes away the Admiralty jurisdiction. This is the principle on which the decisions rest

1827.

Ramsay
v.
Allegre.

from the remotest periods. The contract of bottomry is sometimes cited as an instance of concurrent jurisdiction. But it is a mistake, and an instance cannot be cited, better to illustrate the true doctrine on this subject, than this species of contract. If executed by the master, jurisdiction of it is exclusive in the Admiralty, because it gives remedy only *in rem*. But if executed by the owner, it becomes also a personal contract. Yet who ever heard of a remedy upon it as such, any where but in a common law Court, or a Court of equity ? The contract of *respondentia*, which is as much a maritime contract as bottomry, gives no jurisdiction to the Admiralty either *in rem* or *personam*. (2 *Brown*, 196, 197. and 4 *East*. p. 319.)

· The case of *Menetone* v. *Gibbons*, (3 *Term Rep*. 267.) has nothing new in it ; it is a recognition of doctrines as old as the hills. The question was, whether an hypothecation was taken out of the Admiralty jurisdiction, because it was, in that instance, a sealed instrument. The general jurisdiction of the Admiralty to proceed *in rem* on a bottomry bond, was not denied. The Court explicitly acknowledge the doctrine, " that if the common law can try the cause, the Admiralty shall not, and affirm the jurisdiction of the Admiralty merely on the ground that there was no action against the party at common law, and the common law Courts could not proceed *in rem* under the hypothecation." As to the rule there laid down, " that the jurisdiction of the Admiralty shall be adjudged *secundum subjectam materiam*, it is as ancient as *Bridgam's case*, in the time of Hobart. But this decision is of importance here in two points of view ; since the Court reason upon the principle throughout, that the Admiralty jurisdiction is to be tested by the common law remedy, and the grant of prohibitions.

There was a case decided in this Court in the year 1824, which merits some attention. I mean the case of *The St. Jago de Cuba ;* in which the Court, at first view, would seem to have given a decision in favour of the claims of material men upon a foreign ship, in a case where no actual hypothecation had been executed. But there are several considerations from which it will appear, that the Court did not commit itself on that subject. The most material is,

that the question arose upon the application of money in the registry of the Court, arising from the sale of the vessel for another cause. And, in such instances, it will be seen from several cases, some of which have been noticed in the course of this discussion, that the Court may act towards creditors as if that had been done which might lawfully have been done in their favour. And there is a peculiar propriety in doing this, when the Court, by selling the vessel, has put it out of the power of the captain to give that security to creditors which it is reasonable to suppose would have been given, where the captain had no other means of getting advances made of money or materials. Several cases have been noticed of the captain himself having the benefits of an actual hypothecation extended to him when he expends his own money where he might have raised it on bottomry, and the proceeds of the vessel are in the registry of the Court. Yet this has been severely questioned in the British Courts. (9 *East*, 426.) Attention to the language of the Court, also, will show, that they have been guarded on this subject.

The question which the Court is examining is, not whether the lien of a material man attaches independently of an actual hypothecation, but whether, if the master has exercised this " power of pledging or subjecting the vessel to material men," the forfeiture to the government, without notice, would supersede their rights. And, although speaking of implied liens, whether the material man here retained his supposed lien on the money in the registry, was distinctly the question, and the language of the Court ought not to have any other effect given to it.

Yet, I am free to confess, individually, that in a case in which an hypothecation would be so clearly valid and legal, if actually made, I should want nothing but authority to induce me to sustain such a claim against the vessel; with regard to money in the registry, I think this case is authority for sustaining it, and that it is sanctioned by other authorities. (Vide case of *The New-Jersey* and *the John, 3 Rob.* 288.)

Mr. *Brown* (2d vol. p. 100.) has thought proper to charge

1827.

Ramsay
v.
Allegre.

the common law Courts with having " involved the subject we are now upon in endless confusion."

To me it appears, that the charge may more correctly be made upon those who have engaged, like himself, with so much zeal, in an effort to shake the authority of a course of decisions that are uniform and consistent, and with one single exception, (which exception is acknowledged as arbitrary, or positive law,) reducible to a single principle—a principle altogether fatal to this action in its origin, since there can be no question that the party here had his common law remedy.

And I consider the effort particularly ungracious in an author who is driven to acknowledge its futility so often; one who confesses, in so many words,

" That if the parties have bound themselves to answer personally, the Admiralty cannot take cognizance of the question." (vol. 2, p. 101.)

" That the Admiralty has, in a great measure, (he should have said, altogether,) dropped its claim to taking cognizance of charter-party, freight, and suits by material men, and almost all other proceedings upon contract, except those for recovery of seamen's wages, or enforcing bottomry bonds." (p. 103.)

" That the Admiralty is excluded from jurisdiction of contracts if personal, or sealed, or made on land." (p. 107.)

" That the jurisdiction of the Instance Court of Admiralty, which is at present *seemingly* (he should have said *actually*) allowed by the law Courts, is, that it is confined, *in matters of contract*, to suits for seamen's wages, or those on hypothecations; in matters of tort, to actions for assault, collision, and spoil; and in *quasi* contracts, to actions by part owners for security, and actions of salvage." (p. 122.)

" That the contract of insurance is, in practice, uniformly and decidedly out of the cognizance of the Admiralty." (p. 188.)

And, finally, to acknowledge, in the last page of his book, among his *errata et omissa,*

" That personal contracts are held not to be cognizable in the Admiralty."

It has sometimes been said, that this is a disputed juris-

diction; but by whom is it disputed? Not by the Courts of Great Britain; for, in all their Courts, as well of common as of civil law, when called distinctly to act upon the jurisdiction of the Admiralty, there is no dispute, no contrariety of opinion; they all are governed by the same rules of decision. From time to time, some extravagant admirer of Admiralty jurisdiction, or royal prerogative, has risen up in England, who has revived the ancient murmurs uttered by the friends of that Court, when reluctantly putting off its usurped powers; but, with that exception, I know of no part of the English law that seems more clearly fixed than that of the Admiralty jurisdiction. The misfortune is, that people will not be content to leave it as they find it, but employ themselves in efforts to revive what they cannot but acknowledge has been long since extinct. If the learning upon this subject should appear remote and antiquated, let it be remembered, that the law has been fixed in England for two centuries. And since the futile attempt of Sir *L. Jenkins* to revive it, no one, I believe, until Mr. *Brown* appeared before the public, had made any attempt to change the law of the Admiralty in that kingdom.

1827

Ramsay
v
Allegre.

I have felt it my duty to pay some attention to the subject for several reasons.

In the first place, I stand before the public as bearing my share of the responsibility incurred for certain opinions expressed in the case of *The General Smith*. For the just extent of my responsibility in that case, I must rely on the repeated decisions which I have made in my circuit in hostility with that doctrine. But I am willing to treat it as my own error, and shall, on that ground, claim the privilege of treating it with the greater freedom; at least I shall endeavour to administer the antidote if I have diffused the poison, and claim credit for an unequivocal proof of my repentance by a public acknowledgment that it was inexcusable.

I will now examine that case upon its authorities and its consistency with itself.

The case of *The General Smith* was a case of the most extravagant attempt ever made to enforce this supposed lien of material men. It serves to show to what embarrassments

the commercial world might be exposed by pushing these maritime liens to excess. Since, upon the same principle on which the libel was there filed, however long the time that had elapsed, whatever number of voyages the vessel had made; and whatever changes of property she might have passed through, she would still have remained liable to material men. For, in that instance, the General Smith had made a voyage, and the property of her been changed, before the libel was filed. She was admitted, too, to be an American ship, in her home port. The Court below very properly dismissed the libel, and this Court did not hesitate to affirm the dismission; and, confined to its just import, as an adjudication, it is most unquestionably correct.

No man will subscribe more implicitly than myself, to the authority of decisions in this Court; and I am ready at all imes to adhere to the principles necessarily deducible from, or conducing to such decisions. But farther than this no judge is bound to subscribe to authority, for no other subjects are considered and adjudicated.

But the report informs us, that Mr. Pinkney, who argued against the material men, " admitted the general jurisdiction of the District Court as an Instance Court of Admiralty over suits by material men *in personam* and *in rem*, but denied that a suit could be maintained in the present case, because the parties had no specific lien upon the ship for supplies furnished in the port to which she belonged. That in the case of materials furnished or repairs done to a foreign ship, the maritime law has given such a lien, which may be enforced by a suit in the Admiralty. But in the case of a domestic ship, it was long since settled by the most solemn adjudications of the common law, (which was the law of Maryland,) that mechanics have no lien upon the ship itself for their demands, but must look to the personal security of the owner." (4 *Wheat. Rep.* 441, 442.).

Now I have too high an opinion of Mr. Pinkney's law-reading, and of his talents as an advocate, not to be well convinced that in this, as well as the residue of the argument attributed to him, he must have been misunderstood. And I find my sanction for this belief upon the face of the report itself: for. with the exception of the nullity of the

lien claimed against a domestic ship, the authority which he quotes to sustain his doctrine, contradicts it in so many words.

His quotations are *Abbott on Ship.* pt. 2. ch. 3 sec. 9 to 13, and the case of *The Levi Dearborne*, (4 *Hall's Am. L. J.* 97.) The last quotation was a case of material men suing *in rem* in a home port, and was in point. But the quotation from Abbott was no other than the very passage on which I have before commented, and which, although commencing with stating the doctrines ascribed to Mr. P. as prevailing on the continent of Europe, shows most distinctly that the law is otherwise in England. Mr. P. never would have quoted, to support such doctrines, an author who has been shown to assert " that a shipwright, who has once parted with a ship, or has worked upon it without taking possession, and a tradesman who has provided ropes, sails, provisions, or other necessaries for the ship, (i. e. material men,) are not by the law of England preferred to other creditors, nor have any particular claim or lien upon the ship itself, for the recovery of their demands."

Mr. Pinkney's quotation from Abbott comprises, and is limited to the sections that are occupied in maintaining the doctrine thus laid down by the author, and in showing, expressly, that it extends to a foreign as well as a domestic ship. In section 10, the author cites *Justin* v. *Ballam*, (2 *Lord Raym.* 805.) which he considers as conclusive against the foreign ship. The distinction taken, is not between a domestic and foreign ship, but between a ship " on her voyage and absent from her owner, and one in her home port." And, even in that case, the law, as laid down by the learned annotator to Abbott, in a note to the 8th section, upon 9 *East*, 426. in the language of Lord Ellenborough, is, " that the master *may hypothecate*, not that the hypothecation attaches *per se* on the contract for necessaries." It is true, he cites Judge Peters' decision in the case of *The New-Jersey*, for a contrary doctrine; but he seems not to have adverted to the distinction recently admitted between distributing money in the registry, which is Judge Peters' case, and that of arresting the vessel and subjecting her to sale. Nor has he adverted to the fact, that Judge Peters places his decision on the autho-

1827.

Ramsay
v.
Allegre.

rity of the English cases, which the text of Abbott alone will snow are directly hostile to it. To which may be added, that even Judge Peters does not countenance the doctrine of a right of proceeding *in personam*, attributed to Mr. Pinkney. But this, also, when we find the rest of his reported argument so clearly a mistake. we have good reason for hesitating to ascribe to him. And the rather, for that, so well read a lawyer would not have advanced so bold a doctrine, without attempting to find some shadow of authority for it. Even Mr. Winder, who argued against Mr. Pinkney, does not venture to put his case upon the law of England, but relies upon the law of the continent, and insists on a right arbitrarily to adopt it here.

Mr. Winder quotes Judge Winchester's decision, and the case of *De Lovio* v. *Boit*, from 2 *Gallison*, 400. But Judge Winchester affords no authority, since he decides on grounds which I have shown to be altogether heterodox or exploded.

With whom the idea originated, that the Admiralty and maritime jurisdiction vested by the constitution in the United States, was that which the Admiralty possessed or pretended to, before the time of Richard II., I am at a loss to conceive. Judges Hopkinson, Bee, and Peters, all distinguished revolutionary men, educated before the revolution, and deeply engaged in public life until long after the constitution, concurred in fixing the period of the revolution for the law of the jurisdiction of the Admiralty. And who can doubt that the doctrine of that day was, that the jurisdiction anciently claimed by that Court, was founded in usurpation. The acts of Richard expressly declare it; that of Henry treated it as vain and void ; and such all history proves it. Yet it is only by going back to those early times, that shadow of authority can be found for the pretensions which it seems disposed to put forth in our day.

Of the case in 2 *Gallison*, I will only remark, that it was a decision in the first circuit, in which the right to proceed *in personam* in the Admiralty was asserted, in a suit upon a policy of insurance; and if the nisi prius decisions of the judges of this Court are of any authority here, it is only necessary to observe, that a contrary decision has been rendered in the sixth circuit. Let them, therefore, fall toge-

ther; and let the question be tested upon principle and authority, independent of those decisions.

I now come to the consistency of the opinion of the Court in *The General Smith*, with itself.

That decision is, that the common law is the law of Maryland with regard to the rights of material men, and that it has long since been settled that they have no remedy *in rem*. But the opinion is introduced with a *dictum* purporting, that had they sued in the Admiralty *in personam*, there would have been no doubt of their right to proceed.

And here the question is, whether there can be found any where in the books, a case in which an action *in personam* could be maintained in the Admiralty, wherein the action *in rem* was denied to that Court. No such case can be found; and the reason is obvious; that right alone would take away the Admiralty jurisdiction altogether, since it would follow, that the right might be pursued at the common law : the case of seamen's wages always excepted, which I regard as positive law, and which, indeed, has been supposed by some to be retained by the Admiralty, under the authority given that Court by a statute of one of the Henrys, to control mariners in regard to the amount of their wages.

Let the cases be searched from the remotest period down to the time of *Menetone* v. *Gibbons*, and the ground of prohibition, and of recovery, under the 2d of Henry IV. will uniformly be found to be the competency of the common law to enforce the contract. This is the principle by which even their jurisdiction *in rem* is controlled, and hence it follows, that in no case in which they are prohibited from proceeding *in rem*, can they have the action *in personam*.

I consider the decision, therefore, in the case of *The General Smith*, as conclusive against the doctrine which asserts the right of material men to proceed *in personam*, and upon the authority of which the present suit is avowedly instituted. At least, as there is no authority given for it by the Court, we may conclude, that it has no better authority than that on which we are given to understand Mr. Pinkney relied for the same doctrine.

I have now said a great deal on this subject, and I could not have said less, and discharged the duty which I feel that

I owe to the community. I am fortifying a weak point in the wall of the constitution. Every advance of the Admiralty is a victory over the common law ; a conquest gained upon the trial by jury. The principles upon which alone this suit could have been maintained, are equally applicable to one half the commercial contracts between citizen and citizen. Once establish the rights here claimed, and it may bring back with it all the Admiralty usurpations of the fifteenth century. In England there exists a controlling power, but here there is none. Congress has, indeed, given a power to issue prohibitions to a District Court, when transcending the limits of the Admiralty jurisdiction. But who is to issue a prohibition to us, if we should ever be affected with a partiality for that jurisdiction ?

I, therefore, hold, that we are under a peculiar obligation to restrain the Admiralty jurisdiction within its proper limits.

That in case of contracts it has no jurisdiction at all *in personam*. except as incident to the exercise of its jurisdiction *in rem*.

That with regard to the contracts of shipwrights and material men in her home port, the vessel cannot be subjected, unless by express hypothecation by the owner.

That on her voyage, and where the master is destitute of other means of raising the necessary funds, she may be so subjected by the master, but it must be by actual hypothecation.

But that when the ship has been sold for other claims, and the money in the registry, so that the master no longer has it in his power to raise money on her bottom to satisfy demands which have been legally incurred, cases may arise in which the claims of material men and shipwrights, and of the master himself, may be sustained, without actual hypothecation.

Decree affirmed.[a]

---

[a] The Editor of these Reports feels it to be a duty which he owes to self respect, and to the independence of the bar, to take some notice of the comments made in the above opinion upon the account

given in the third volume of this work, of Mr. *Pinkney's* argument in the case of *The General Smith*. Whether the Editor was so unfortunate as to misunderstand the argument of that truly learned person, he is willing should be determined by the test proposed in the above opinion. No other reason is there given for questioning the accuracy of the report, than that Mr. Pinkney was too well read a lawyer, and too able an advocate, to have urged an argument which is contradicted by the authorities he cites in its support.

This argument includes the following positions:

1. An admission of " the general jurisdiction of the Admiralty over suits by material men *in personam* and *in rem*."

All that is necessary to remark upon this passage is, that it was superfluous for Mr. P. to cite any authority for a concession voluntarily made by him, *argumenti gratia*, and it does not appear that the authorities subsequently referred to in the margin were intended for that purpose. On this occasion, as on many other occasions, he probably spoke from the fulness of his learning, and with a confidence inspired by his well grounded reliance upon its accuracy

2. That no " suit could be maintained in the present case, because the parties had no specific lien upon the ship *for supplies furnished in the port to which she belonged*."

This is admitted to be an exception to the sweeping denunciation against the applicability to the argument of the authorities cited in its support. The authorities cited are, " *Abbott on Shipp*. pt. 2. ch. 3. s. 9—13. and the cases there cited. Woodruff *et al*. v. The Levi Dearborne, 4 *Hall's Am. Law Journ*. 97."

3. " That in the case of materials furnished, or repairs done to a *foreign ship*, the maritime law has given such a lien, which may be enforced in the Admiralty."

The passage cited from the text of *Abbott*, (s. 9.) shows, that by " the maritime law" of all Europe, England only excepted, material men have such a lien, which may be enforced in the Admiralty. Such was the law of Rome, and such is the law of all the maritime countries of the European continent. Such, too, was the law of Scotland, until it was recently altered by a decision " founded principally, as it seems, upon a desire to render the law of Scotland conformable to the law of England upon this subject." (*Abbott*, pt. 2. ch. 3. s. 14. p. 142 ) How far the limits prescribed to the jurisdiction of the Admiralty in England over maritime contracts, by the decisions of the common law Courts, after ages of controversy, had been adopted in this country before the revolutio, and how far the grant of Admiralty and maritime jurisdiction in the constitution of the United States is to be construed with reference to those decisions, are questions foreign to the purpose of this note The only question here is, whether Mr. Pinkney was warranted in quoting this passage,

"and the cases there cited," as an authority for the position, that "*the maritime law* has given such a lien, which may be enforced in the Admiralty." The question is not whether the authority is conclusive to support the position; but whether it is sufficiently pertinent to render it probable that it was actually referred to for that purpose. It may be, that there is, as is contended in the above opinion, some discrepancy among the decisions of the Admiralty judges in this country on the subject; but still the cases collected in a note to the American edition of *Abbott*, (p. 160.) are believed to be sufficient to rescue the argument attributed to Mr. Pinkney from the imputation of being directly contradicted by the authorities quoted to sustain it. The case of *The Levi Dearborne*, determined by Mr. Justice Johnson in the Circuit Court of Georgia, is also quoted by Mr. Pinkney for the same purpose. That " this quotation was in point," will appear by the following extract from the opinion of the learned judge, as we find it reported by Mr. *Hall.* " The lien on vessels for material men and shipwrights, exists only *in a foreign port.* Where the owner is present and resident, the common law principle must govern. In such case, no lien on the vessel is created. In the case of the owner, who, though present when the work and materials are furnished, is transient and non-resident, I am disposed to think otherwise, *and that in such case the lien attaches.* It is proper also to state, what shall be deemed a foreign, and what a domestic port, as to this question: *the sea ports of the different States ought, in this respect, to be considered as foreign ports in relation to each other.* Charleston, for instance, is a foreign port, as to a claim of this nature made in Savannah." 4 *Hall's Law Journ.* 101.

4. That " in the case of a domestic ship, it was long since settled by the most solemn adjudications *of the common law,* (which was the law of Maryland,) that mechanics have no lien upon the ship itself for their demands, but must look to the personal security of the owner."

This position is not denied to be supported by the authorities said to have been quoted by Mr. Pinkney; but the error imputed to the report consists in the asserted liability of a foreign ship to such a lien, which (as it has been seen) is recognised and enforced by the general maritime law, and which appears also to have been maintained by several Admiralty judges in this country, and especially by Mr. Justice Johnson, although it may not have been adopted by the peculiar law of England.

In making these remarks, the Editor has certainly not been influenced by any feelings of disrespect towards the learned judge by whom the above opinion was delivered, nor even by a desire to controvert the peculiar doctrines maintained in that opinion. It is his own character for accuracy and integrity as the Reporter of the decisions of this Court which the Editor feels to be assailed, and, there-

fore, seeks to vindicate. It is a duty which he owes to the Court, to the profession, and to his own reputation, to maintain the fidelity of the Reports, which are received as authentic evidence of the proceedings and adjudications of this high tribunal. If they are not to be relied on in this respect, they are worthless. In closing his labours, the Editor has the consolation of reflecting, that it has been his humble aim to do justice to the learning and talents of the bar, and to uphold the honour and dignity of the bench. How far he has succeeded in this attempt, it does not become him to speak; but he is willing to submit to the impartial judgment of his professional brethren, whether the above accusation is supported by evidence.