Mr. Chief Justice TANEY
dissenting.
I dissent from the judgment of the- court in this case, and adhere to the opinion I gave at the circuit. •
‘ The principal question is, whether certain.repairs and supplies furnished to the barque Laura, of Plymouth, in the State of Massachusetts, while she was in the port of Valparaiso, in Chili, in February and March, 1852, are a lien upon the vessel.
The appellants are citizens of Massachusetts, and, at the time- of making and furnishing these repairs and suppliesj and until and after this libel was filed, were the owners of the barque. She was built for them at Newburyport, under the .superintendence of a certain Phineas Leach, who was by profession a mariner; After the vessel was completed, she was placed under his command, as master; and, in the year 1841!;, he and the appellants agreed that he should sail the vessel on what, in the New England ship-owning States, is familiarly called “a lay” — that is to say, he was to victual and man her; pay one-half the port charges, and be entitled to one-half of the freights or earnings. This is the contract, as stated by Lgach in his testimony. No written contract is produced. Indeed, contracts of this description, it would seem, are so well known and understood in the States above mentioned; that they are often made orally, and not in writing. And when the owners agree with a mariner that he shall sail the vessel-on “a lay,” both parties understand that the mariner is to take the command of her as master, to victual and man her, and pay half the port charges; the owner to keep the vessel in repair, and the freight and earnings to be equally divided between them. lípon a contract of this kina, the vessel, during its continuance, is, under the exclusive control of the master, as respects her voyages and employment. He alone has the right to determiné what voyages he will undertake — what cargo he will carry — upon what terms — and to *34 what ports he will sail in search of freight. His share of the-earnings of the vessel are his wages, and he receives no other compensation for his services as master.
Before I proceed to state the facts out of which this controversy has arisen, it is proper to say that Leach states in his testimony that, in addition to the contract above mentioned, it' was agreed, between the appellants and .himself, that he should have the right to become a part owner df the vessel, to to the amount of one-eighth, whenever he paid for it. But he never paid anything on this account, and never, therefore, had any interest as part owner';-and, upon his return to Plymouth, in 1852, as hereinafter mentioned, when his connection with the Laura ceased, this contract was cancelled. It was a written contract; but whether it was a part of his contract to sail the vessel upon “a lay,” is not stated in the testimony.
As Leach never became part owner, his authority over the vessel was derived altogether from his .contract to sail her upon the terms above mentioned. That contract, as stated by him, was indefinite as to its duration. No particular time was fixed for its termination, nor the happening of any particular event. And it was during the continuance of this-contract that the voyages were made, and the acts done which have given rise to this controversy.
The material facts in the case are derived mainly from the testimony of Leach, who was produced as a witness by the owners, who are the appellants; and it requires a close and ■careful scrutiny to understand the bearing of different portions of his testimony upon the different points raised in the argument. The examination itself, under the commission to take testimony, which was executed at Boston, is singularly ■involved and confused; and the answers, I regret to say, often showing a disposition to prevaricate, and a desire to make the Best case the witnéss could for the owners, and against the. libellants.
His testimony begins by describing several voyages which he made in the year 1849, which are not material to the matter in issue, until he comes to the one from Rio to Valparaiso. This was his first .voyage to the Pacific, and he arrived at Valparaiso in November, 1849, with a cargo consigned to Loring & Co., the libellants.. This company was composed of citizens of Massachusetts, domiciled at Valparaiso for the purposes df commerce. In December, 1849, he sailed from Valparaiso to San Francisco, .with a cargo on freight; the freight amounting to about seven thousand dollars. Being unable, to procure a cargo on freight at San Francisco, he sailed for Tal- *35 caimana in ballast, and, no freight offering at that place, be sailed for Maulé in ballast, but was prevented from entering the. port by bad weather and a had bar, and proceeded to Val-Earaiso. He arrived there early in July, 1850. While there, e obtained advances from Loring & Co., which-enabled .him to purchase a cargo for the Laura on his own account, with which he sailed for San Francisco, where he arrived in November, 1850. .
While he was in San Francisco, he made an arrangement with Flint, Peabody, & Co., of that place, by which, upon his return to Chili, he was to purchase" cargoes on joint account,, and ship or consign them to that house at San Francisco. He was to purchase cargoes by means of bills drawn on them, and they were to honor his drafts. There was no limit as to the time; but this agreement was conditional, and was to/ depend upon the ability of Leach to make ^arrangements in' Chili, by which he could raise money on those drafts to purchase the' cargoes; and if he succeeded in making those arrangements, he was to remain in Chili to make the purchases. The arrangement was-not confined to cargoes by the Laura, but he was to buy and ship according tó his judgment.-
When he left San Francisco, he again proceeded to Talcahu-ana in ballast, where he arrived in February, 1851. He met there Mr. Bowen, one of the firm of Loring & Có., and told him that he.wanted another, cargo, but had not money to buy it, and Bowen thereupon gave him a letter of credit upon his house at Valparaiso, by which he was authorized to draw on them for ten thousand dollars, payable eight days after sight. Being unable to complete his cargo at Talcahuana, he proceeded to-Valparaiso, where he arrived in the month of April or May following, and obtained the .balance of ,his cargo by the aid of further advances from Loring & Co. He then mentioned to them his arrangement with Flint, Peabody, & Co., and asked if Loring & Co. would give him facilities in tiie way of funds to carry out this arrangement. They agreed to advance the funds, upon an interest account with hipa, charging, five per cent, for advances, and one per cent, a month for interest, arid' they were to be paid by remittances froin San Francisco without drawing bills. , Leach acceded to this arrangement, and directed them to charge the cargo then on board the Laura at Valparaiso to the joint account of Flint, Peabody, & Co., and himself, Leach. He then, as he says, “put the mate, Reuben S. Easton, in as master,” and sent him to San Francisco, Leach remaining at Valparaiso. This was in May, 1851, and he remained there until March, 1852, carrying on and superintending those transactions.
*36 During this period, lie engaged extensively in mercantile business, shipping cargoes by other vessels, as well as the one by'the Laura, and obtaining the means of purchasing them by the arrangements he had made with Loring & Co., as here-inbefore stated; and he-had a desk in their counting-house, at which he transacted his business.
The Laura did not return again to Valparaiso until February,'1852. (It was then founddhat she needed repairs and sup-, plies to a large amount to fit her for another voyage; and Leach also wanted funds to purchase another cargo for her. He had at that time, it seems, determined to return to Plymouth; hut before he did so, he wished to despatch the Laura, under the command of Easton, on a voyage to Peyta and Panama, with a cargo purchased on his own account. He had no funds for either purpose. He states that he had hut $500, and this, it appears, he needed for his personal expenses; and the repairs were made and the supplies furnished for the vessel hy Loring & Co., at his request, to the amount of $2,707.69. Leach states that they were, necessary, and made and furnished with economy; that he was himself .on board, superintending and directing them; that Easton was also on hoard assisting him, hut had nothing to do with ordering or directing them. He merely executed Leach’s orders. The cargo was likewise purchased and paid for hy Loring & Co. for Leach, and at his request.
The repairs were made and the supplies furnished in the latter part of February and early part of March, 1852, and the cargo put on hoard immediately afterwards. The invoice is dated Valparaiso, March 18th, and is headed, “Invoice of sundries purchased and shipped hy Loring & Co., on hoard the barque Laura, for Peyta and Panama, on account and risk of Capt. Phineas Leach, consigned to his order, for sales and returns to.Loring Co.” — the aggregate amount being $5,779.81. The vessel sailed, as soon as the cargo was on hoard, under thp command of Easton. And on the 20th of March, two accounts were stated by Loring & Co.; one for the repairs and supplies to the Laura, and the other their private.or personal account.against Leach; both of which, were signed hy Leach on that day, with a written admission that they were correct.
The first mentioned of these accounts is headed, “ Barque Laura and owners to Loring & Co., Dr.,” and states the particular items of repairs and supplies, amounting, as before mentioned, in the aggregate, to $2,707.69'. This account is the matter now in dispute. The other is headed, “ Dr., Capt.. P. Leach in account with Loring & Co. to 20th of March, 1852,” showing a balance due from Leach of $8,527.69. Among other *37 items, lie is charged, in this account, with the amount of the account for repairs and supplies, and this item is charged thus — ■“ our ac. with barque Laura. ” — and he is also charged with the amount of the invoice above mentioned thus — u our invoke sundries for Laura'due April 12, 1852” — showing 'that the charge for the repairs and supplies was always-kept separate and. distinct from Leach’s personal account.
On the day these two separate accounts were adjusted and signed by the parties', or in a day or two afterwards, Leach left Valparaiso for Panama, and from thence proceeded home. He "states that he arrived at Boston on the. 20th of April following, and it appears, by the documents in evidence, that, on the 9tn of July next after his return, the appellants agreed with Francis H. Weston that he should proceed to Panama, or wherever the vessel was lying, and assume the Command of her as master; and, after fulfilling any engagement she might be under, should proceed with her for a load of guano on freight, or any other freight that could he obtained, to an 'Atlantic port. Weston proceeded accordingly, and arrived at Valparaiso in September.' The Laura arrived there about a fortnight afterwards, when he assumed the command, and Easton left her.
In the execution of his orders from the owners, Weston proceeded on the voyage directed by them, and then brought the vessel and cargo to Baltimore, where he arrived in June, 1853; and immediately after his arrival she was arrested upon the libel now under consideration. -
This narrative of the facts in. the case is necessary in order to understand how the questions discussed at the bar have arisen. There are other circumstances in evidence, relating, to different points, which it will be material to advert to more particularly hereafter.
As I have already said, the principal -matter in. dispute' is, whether the repairs and supplies furnished to the barque in the port of Valparaiso, as hereinbefore mentioned, in February and March, 1852, were a lien upon the vessel at the time this libel was filed.
In deciding this question, the first point to be considered is, in what relation did Leach stand to the vessel^ while he was sailing her under this contract? Was he the owner for the time ? And in determining the legal effect and operation of contracts made by him, are they to be regarded as the contracts of the owner, or the contracts of the master ?
This is a question of the highest importance to the commercial interests of this country. It is well known that.almost tho whole of our immense coasting trade is carried on by vessels ~ owned in the ÍTortheastern States of the Union; and the far *38 greater part of them are.sailing under contracts like this. And upon our coast, stormy and dangerous as it is at certain seasons of the year, very serious damage is often sustained by these vessels, and heavy amounts frequently required and obtained in the ports of other States for repairs and supplies to enable them to proceed- on their voyages.
Now, if Leach is to be regarded as owner for the time when' he was sailing the Laura under the agreement, then by the maritime law .the repairs and supplies furnished at his request are presumed to have been furnished upon his personal credit, unless the contrary appears; and in that view of the subject, Loring & Co. have not, and never had, any lien upon the vessel; and the libel against her cannot be maintained. But if, on the contrary, Leach is to be regarded as master, and as making the contract by virtue óf his authority over the barque in that character, then these repairs and supplies in a foreign port, if necessary to enable the vessel to proceed, are presumed to have been made on the credit of the vessel, unless the contrary appears, as well as on the cdedit of the owners and Leach; and m this aspect of the case, Loring & Go. had a. lien upon her, which they may enforce in this proceeding unless it has been waived or discharged.
These- are the established principles of maritime law in this country, as heretofore recognised and administered in the courts of the United States. And I do not deem it necessary to refer to English eases, or to the decrees or doctrines in the different nations on the continent of Europe, which have been cited in the argument, because I consider' the rule, as I have stated it, to be conclusively settled in this country by an unbroken series of decisions in this court and at the circuits. The case of The General Smith, (4 Wheat., 443;) The St. Jago de Cuba, (9 Wheat., 416;) and the ease of Ramsey v. Allegre, (12 Wheat., 611,) explained and commented on in the case of Andrews v. Wall and others, (3 How., 573,) may be regarded as the leading cases on this subject.
The case before us is one of the more interest, because it is the first in which the construction and legal effect of these contracta for sailing on a “lay” has come up for decision in this court.. They are, as I have said, peculiar to a particular portion of the Union, and are scarcely ever to be found in the maritime contracts of any other part of the commercial world.. They are also comparatively modem in their use. And if it is held, that a person furnishing necessary repairs and supplies in a foreign port, to a vessel sailing under a contract of this kind, has not a remedy against the owner, and also a lien on, the vessel for such provisions and supplies^ as well as for repairs *39 to the vessel — although they are both furnished at the request of a master who is without funds, and has no other means of obtaining them — then this class of eases will form an exception to the general maritime code of the United States, to which vessels belonging to the ports of-other. States, and sailing under the usual contract with the master, for certain wages, are subjected; and the parties making the repairs or furnishing the supplies will be deprived of the securities to which they nave heretofore supposed themselves entitled, and upon which they have mainly relied; for the personal responsibility of the master, after he is suffered to leave the port, is most commonly of very little value. And it would exempt the ship-owners, in One portion of the United States, from the liabilities and burdens imposed upon those of other States, merely upon the ground that in the one the owner compensates his captain by. allowing him a share of the nett amount of the freight earned by the vessel, and in the other by fixed and certain- wages. For this, in truth, is the only difference between vessels sailing under a “lay” aiid those sailing under the usual and customary contract between the owner and master.
In making the inquiry whether Leach was owner while sailing under this contract, we shall find few if any eases in the English decisions to assist us. ' For contracts of this kind, as I have already said, are hardly if ever used there: And I can find no case where the question arose as to who was owner for voyage in which the contract is not clearly distinguishable from the one before us.. And in all of the cases in which it has been held that the general owners were not responsible, it will be found that, by the terms of the contract, the entire and exclusive possession and control of the vessel was transferred for a certain time,.or a particular voyage or voyages, and where the general owner, during the time stipulated, had no right to exercise any act of ownership • over her. „In other words, they are cases in which the court held, that the Vessel was let or demised to the party for the time, so as to, vest the right of property in the charterer, leaving in the general owners a re-versionary interest, subject to the particular interest so let or demised. And whether this is the case or not, and whether there is a special and exclusive property in the charterer, does not depend upon any particular form of words or any particular facts. The general rule1 in relation to the construction of such contracts is1 laid down in Abb. on Ship., 61, (7th Am. Ed’n,) in the following words, as the result of the' various decisions to which he refers: “From these cases (he says) it appears that the question whether or not the possession of a vessel passes out of thé owner or charterer depends upon no single fact .or *40 expression, but iipon tlie whole of the language of the contract-as applicable to its attendant circumstances.”
But although we find no case in the English reports that can be regarded as in point, contracts like the one before us¡, and indéed in the same words, have, on several occasions, been brought before the Circuit Court of the United States in -the first circuit, where they have been carefully and deliberately considered by the learned judge who recently presided in that circuit. And it has been uniformly held in that court, by Mr. Justice Story, that the master sailing a vessel under such a contract as this is not the exclusive owner for the voyage; and, if regarded as owner at all, is a qualified and limited one; and his character and authority, and duty as master, is not merged in it; and that his contracts'for repaira find supplies in a foreign port are made in that character, and are a lien upon the vessel.
. One of these contracts came before him in the case of the Nestor, reported in 1 Sum., 73, and was decided in 1831. The claim was for a cable furnished to the vessel at Alexandria, in the District of Columbia, at the request of the master. . The vessel belonged to Portland, in the State of Maine. And the court held that the vessel was liabl,e, unless it was shown that the credit was exclusively given to the master. It is true that the article furnished in that case was for the use of the brig, which the owner was bound to keep in .repair. But the principle decided applies directly to the case before us — that is, that the master, under one of these contracts, is not owner for the voyage, so far as to exclude his character and authority as captain. And that his contracts for repairs and supplies are presumed to be made in the latter character, and-to create the usual maritime lien upon the vessel, and the usual liability of the owner, unless the presumption is repelled by proof that the credit was given to him. The whole subject is fully discussed in this case,, and such will be found upon a careful examination the result of the opinion.
The case of the Cassius, 2 Story’s Rep., 81, was a contract of the same description, between the master and owners ; and in that case the rights of the master and the responsibility of the owners for his a-ctq in a foreign port were fully considered; and the decision turned upon the question whether, under one of these contracts, the master was the owner for the time. And the learned judge, speaking of the case of Taggart v. Loring, 16 Mass. R., 336, says: “ That case is distinguishable in its actual circumstances from the present. The argument in that case does not appear from the statements of the report to have been identical with the present. And if it were, I must say that I should have some difficulty in acceding to the authority of that *41 case, if it' meant to establish that the master had an exclusive special ownership in the ship for the voyage. I should rather incline to the opinion, that if he had any ownership at all for the voyage, it was in common with the general owners.” The contract in that case, upon which the libel was filed, was executed by him as master, and the court held that it bound the vessel.
Indeed, I do not see how, upon any fair interpretation of the terms of these contracts, a different construction could bo given to them. There are no words in them which import that it is the intention of the owners to transfer the exclusive right of property in the vessel to the master for the time, nor anything in the character of the contract from which it can be implied— on the contrary, the right of possession remains necessarily in the owners. Eor they are to keep the ship in repair, and the master is only to man and victual her. The. owners have therefore the right, while the contract continues, to take exclusive possession of her, from time to time, for the purpose of putting her in proper repair, and to have her properly equipped, so that she may always be seaworthy, and their property not be imprudently exposed to danger. And whatever Leach did, or was authorized to do, in this respect, was necessarily done as master, holding the possession for the time the repairs were making, not as owner of the vessel, but as agent for the owners, by virtue of his authority as master. And the owners, in a case like this, may, as in the case of an ordinary captain upon certain wages, displace him from the command whenever they think proper — being bound, however, in like manner, to fulfil the engagements into which he hád lawfully entered.
Moreover, he had no connection with the vessel, except under his contract to sail her in the character of captain or master. He had no authority over her, nor any right of possession, nor any power to direct her voyages or movements, except in this ' character. All of his rights were inseparably connected with his official relation to the vessel, and depended upon it. The inducement to the contract was the confidence which the owners reposed in his seamanship, integrity, and capacity for business. It was a personal trust, which he could not delegate or assign to another. It was to be executed by himself; ana the moment he ceased to be master, all right of possession, and all right to control her voyages and movements, ceased also. And if his right to the possession of the barque, and to man and victual her, and contract for freights, and to receive half her earnings, were all inseparably connected with his official relation to the vessel as master, and dependent upon it, I cannot understand *42 how Ms contract for repairs and supplies can be said to ¡be made in any other character.
His relation to the vessel, and his rights in and over her, differ in no material respéct, in a contract of this kind, from that of a master sailing in the ordinary mode, upon fixed and certain wagés, from one port to another, under the direction of the owner, to carry or seek for freight. The only difference is, that a larger discretion as to the voyages to be undertaken is given to the master, and he receives half the earnings, instead'-of certain and fixed wages.’ And I cannot perceive how these two circumstances can give him any ownership of the vessel, or why the master’s contracts for repairs and supplies in a foreign port shall be alien upon the vessel in one case, and not in the . other. The fact that he is to victual and man the vessel cannot of itself give a right of property in hen it is, undoubtedly, a circumstance to be considered m expounding these contracts, but nothing more. Eor the exclusive right for the voyage may as well and legally be transferred where the owners man and victual her, as where it is done by the charterer, provided the contract taken altogether shows that such was the intention of the, parties. It does not, as I have already shown, depend upon any particular fact, but upon the entire agreement. And I can see nothing inyagreements of this kind, as was said by Mr. Justice Story in the case of the Cassius, which indicates an.intention to make the master the exclusive owner during the voyages he might make,, or that would justify the court in giving it such a construction.
I am aware, that in some or all of the States where these contracts are usually made, there are cases in the State courts in which it has been held, that in these contracts the master is the owner, and that his contracts made in the port of another, ■ State are made in the character of owner and not of master, and that an action cannot be1 maintained upon them against the general owners.
I-shall not stop to examine these cases, because the question here is not whether an action can be maintained against the . owners for these repairs and supplies, but whether-they were a lien upon the barque. I admit that I can perceive no distinction in principle between, the personal liability of the general owners and the liability of the vessel. Eor whatever may be the rights and liabilities. of the master and owners, as- between themselves, upon their private contract, they cannot affect the rights , of third parties dealing, with him in Ms character of master, and furmshing necessary repairs and supplies in a foreign port at his request. They know him only as master, and-deal .with Mm in that character.1 And it is the rule of the *43 maritime law, as settled in my judgment by the decisions in the courts of this country, that in a case of that hind the owners personally, as well as the vessel, are liable for the amount. But if the owner is present, and they are furnished to him, it is equally well established, that .the credit is presumed to have, .been given to him personally, and no lien on the vessel is implied. , The decisions in the State courts cannot therefore,, it would seem, be reconciled to the decisions of the Circuit Court of the United States, hereinbefore referred to.
But however this may be,' the implied lien on the vessel in cases like the one before us has been maintained in the Circuit Court. And as the question of maritime lien, with which we are now dealing, belongs peculiarly to the admiralty courts, and the paramount jurisdiction in such eases is vested in them by the Constitution of the United States, it necessarily follows, that it must rest with them to interpret the contract, and to determine whether it created a lien or not, and how, and when, and against whom, it can be enforced.
In the case of the barque Chusan, 2 Story’s Rep., 462, he says: “ The Constitution of the United States has declared that the judicial power of the National Government shall extend to all cases of admiralty and maritime jurisdiction; and it is not competent for the States, by local legislation, to. enlarge or limit or narrow it. In the exercise of this admiralty and maritime jurisdiction, the courts of the United States are exclusively governed by the legislation of Congress, and in the absence thereof by the general principles of maritime law. The States have no right to' prescribe the rules by which the courts of the United States shall act, nor the jurisprudence which they shall administer.”
The opinions of. the State tribunals to which I have referred are certainly entitled to very high respect, upon any question of law that may come before them; yet the question before us is not one of. State law. It is a contract for maritime service, and belongs to the admiralty courts of the United States. And the State decisions, therefore, howevér highly we respect them, carry with them no binding judicial authority, when in conflict with the decisions of the courts of the United States upon questions belonging to the Federal courts. And I the more firmly adhere to the doctrines of the Circuit Court, hereinbefore stated, because, as I have already said, I can see nothing in the terms of the contract, or in its character and objects, that would justify' a different construction. In iny opinion, therefore, Leach had no ownership in the Laura, and in the. contract in' question éxercised the powers of master, and nothing more.
Such being, in my judgment, the meaning and legal effect *44 of the contract between tbe owners and Leach, tbe next question to be considered is, was be still master when these repairs and supplies were furnished ?
The appellants contend, that if be was not owner, but only master, while be was sailing tbe barque, be yet ceased to be master wben be remained at Valparaiso, and placed tbe vessel under tbe command of Easton, and that from that time Easton was the master; and the contract of Leach for repairs and supplies would therefore create no lien. Undoubtedly, the conduct of Leach in this respect was a violation of bis duty to the owners, if he acted without their consent. He was to sail the vessel himself, and this personal trust and confidence could not be transferred by him to another. Such a transfer would be a breach of his contract, and of his duty under it. But that is a question between him and his owners, and they might displace him or (not, as they saw proper. The point here is, did his official relation as master cease when he engaged in commercial pursuits, and remained on shore at Valparaiso ?
Certainly, the misconduct of a captain, while on a voyage or in a foreign port, does not, ipso facto, deprive him of his office. It would be a sufficient reason for the owners to dismiss him; but in this case it is not pretended that he was dismissed or suspended by them. No other person was appointed to the command until after he had voluntarily surrendered it to the owners, after his return to Massachusetts in the spring of 1852. And these supplies had been furnished, at his request, months before the new master was appointed.
Nor did he abandon his official relation to the vessel while he remained at Valparaiso; but, on the contrary, continued to hold possession in person or by his agent, and to exercise the rights and authority of master, according to the terms of ¿is contract with the owners. He continued to man and victual her, direct her voyages, and receive the freights. Easton was paid.by him, and not by the owners; he acted under the direction of Leach, as his agent and subordinate, and'not under the direction of the owners. He was not even allowed to receive, the freight; and when the supplies in question were furnished, Leach was actually on board, in actual command, and Easton acting as his subordinate, under his orders. And as Leach had no ownership whatever in the vessel, all of this must have been done by him as master, and could have been done in no other character; for if he had abandoned that official position, and . Easton was master, he had no authority over Easton, nor any more right to interfere with him on the vessel than any other stranger.
Nor is his absence from the vessel by any means incompati *45 ble with this official relation and authority. It is not necessary for the existence of such a relation, and the exercise of such an authority, that he should always be on her deck. He may be absent for a longer of shorter time, and at a greater or lesser distance, without forfeiting his authorityand when once appointed master by the owners, he continues master until displaced by them, or he himself surrenders the office. > As respects a dismissal by the owners, Mr. Justice Story says, in the case of the Tribune, 3 Sum. Rep., 149, “Being once master, he must be deemed still to continue to hold that character until some overt act or declaration of the owners displaced him from the station.” And certainly there was no such act or declaration while Leach continued in the counting-house of Loring & Oo. And as to. Leach himself, it is obvious, from the facts above stated, that he had not resigned or surrendered the command.
It is said that Easton was master. By what authority was he master ? He was not agent of the owners; he was not appointed by them, nor authorized by them to. exercise any control over the ship. Hor would they have been bound by his contracts if he had made any, nor responsible for his acts. There were none of the relations and trusts which exist between owners and master, for they had not confided the ship to him, and were not even responsible for his wages; and if Leach was not master, and authorized to bind the vessel and owners by his contract, the vessel was sailing without one, and without any lawful' authority from those to whom she belonged. It is true, Leach says he appointed him master; but,that does not clothe him with the authority which the maritime law annexes to that character, unless Leach had lawful power to appoint him. ■ He might, no doubt, have properly sent him on the voyage, and placed the vessel under his command while he remained on shore, if the interest of the owners required or would justify it. And he might, if he pleased, call him master or captain; but by whatever name he chose to call him, he would be nothing more than his subordinate and agent. He would not, in respect to the owners or third persons, possess the authority of master. •
The cases of L’Arina v. The brig Exchange, Bee’s Reports, 198, and the same v. Manwaring, 199, are directly in point on this head. There the party was appointed by the master as captain, and cleared the vessel as such at Havana; yet this appointment was held by the court not to give him the legal relation' of captain to the vessel, nor displace the master appointed by the owners; and it was held that the contract of the latter, within the scope of his authority as master, was still binding lipón the owners. The fact, therefore, that Leach re *46 mained on shore, and sent the vessel upon different voyages, under the command of an agent appointed by him, did not of itself displace him;- he was. still master of the barque, with all - .the powers and responsibilities which are attached to that character. And if the . fact that he remained on shore did not deprive him of his, official character, the circumstance that he was engaged during that time in commercial pursuits cannot alter the case. It cannot make any difference, in this respect, whether he remained idle or employed himself in any particular pursuit.
• But it is said that Leach was not only absent from the barque,, but he was employing her in violation of the orders of the owners, who disapproved of his conduct, and had directed him to bring the vessel home, and that Loring & Co. knew it, and yet encouraged and enabled him to go on in the violation of his duty, by-large advances of money. And it is insisted, that as Loring & Co. were aiding and encouraging him in this breach of duty, and the supplies in question were furnished to enable him .to persevere in it, they were furnished in bad faith to the owners;, and in a court of admiralty, acting upon equitable prin'ciples, can create no Obligation upon them, nor any lien upon their vessel.
If the facts assumed were established by the testimony, I should not dispute the law as above stated. But I think-,the fact that the owners disapproved of his remaining on shore, and engaging in mercantile pursuits, is not only not established, but, Oja the contrary, the weight of the testimony is on the other side, and, notwithstanding the evasive and ambiguous answers of Leach, tends strongly to prove that his conduct in this respect met their approbation.
In examining the- testimony in relation to this question of fact, it is necessary, in order to see the force to which it is entitled, to state it-more minutely than I have done in the preceding part of this opinion, and to note particularly the dates as given by. the witness.
The disapproval of the appellants is brought out by the fol- ■ lowing question, put by the appellants, the owners:
“was yoiir remaining in the Pacific and trading with the Laura done with the consent and approval of the owners ? ” '
To this question Leach simply answers, “ IVo, sir.’’
Upon the cross-examination upon behalf' of the libellants, the .following interrogatories were put to him, to which."he gave the following answers:
Question. “When was their (the owners) dissent made known to you?” .
*47 Answer. “I think it was the second time I was at Valparaiso, which, I think, was in the latter part of 1849,”
.Question. “At what period did the owners take efficient steps to displace you? — at any period-before Captain "Weston was sent out? ”
Answer. “ They did riot, take any efficient steps, any further than to request me to come home.”
. These answers constitute the entire proof of disapproval and dissent' of the owners, of which so ffiuch has heen said in the argument, and -which- has .been so confidently assumed as a fact proved.
It will be observed that the question put by the owners does not" point, and clearly was not intended to point, to any disapproval on their part of his remaining, on shore, or engaging in trade at Valparaiso. It relates altogether to the employment of the barque in the Pacific, instead of the Atlantic. In fact, it could not have ^related to his remaining on shore, or en-f aging in trade, becauáe the -notice of disapproval appears to ave been given but once,, and, was given and received while Leach- was still, sailing the vessel under the “lay,” and seeking and carrying freights, and before he. had purchased a single" cargo for himself, or absented "himself-from her for a' single voyqge; It was never repeated, although he remained nearly two-years afterwards, engaged in commerce, and on shore in the counting-house of the libellants nearly half the time.
■ The fact is clearly established , by Leach’s answers to the'cross-interrogatories above given.- It will be observed' that in these answers he says, he.1 thinks their disapprobation was made known to him the second time he was "at'Valpaiaiso, which he thinks ivas in the latter part of. 1849. How, in the preceding part of his examination he had-stated positively that he arrived . at Valparaiso from Rio with a cargo on freight, consigned to Loring & Co., in November, 1849, and arrived there the second tíme in July, 1850." Without stopping to comment upon the hesitating language; and the vagueness and uncertainty of this answer in relation- to á fact which it is bbvious, from the preceding .part" of his testimony, was perfectly in his recollection, it .is sufficient to say, that,'give him either date, "it- is evident that the disapproval,of the owners-had no connection with his mercantile pursuits, and pointed merely to the employment of the Laura in freighting voyages on the Pácifie, instead of the Atlantic; for if the notice was received by him in 1849, it was before he had engaged in that coasting trade, and must have been written .by the owners in consequence of information -given them by Leach' from Rio, concerning.the freight he had obtained there for Valparaiso, 'and'of his ,intention to seek' *48 freights on that coast; for this was his first voyage in the Laura to the Pacific. He had not then engaged in-.the coasting trade on that ocean, arid had done nothing in. that respect for the owners to disapprove of. And If he did receive the notice, as he says, in 1849, upon his arrival at Valparaiso, it must have been a disapproval of what he informed them he proposed to donot of what he was doing or had done. Certainly it had no relation to his trading on his own account, for there is not the .slightest evidence that he had any such design at that time, nor for nearly a year afterwards.
. • And if we take the other date, the argument is equally strong; for,.if he received it on that occasion, it must have been written some time before. And it was on his second visit to Valparaiso, in Jifiy, 1850, that he for the first time engaged in mercantile pursuits on his own account, and obtained advances for that purpose from Loring. & Co. ■ if the notice reached him at that time, and before he commenced his commercial speculations, the dissent must have applied' to. the place at which he had been seeking freights, ana not to his private speculations. Indeed, taking this as the date of the receipt: of the notice, the inference is almost irresistible, that, the owners must have been- apprised of his intention .to purchase cargoes on his own account, and approved of it; for he had been engaged, when he received this notice, in seeking freights in'the Pacific for about nine months. He had not, it appears, been successful; and after "his first cargo from Valparaiso to San Eranciscb, he sailed-most commonly from port to port in ballast, or with very inconsiderable' cargoes; and as Leach was in constant correspondence with, the owners,' they were of course apprised of his want of success,' aiid would very naturally disapprove -.of his remaining in the Pacific, where'the eárhings of the vessel would give them" very little for their-share of the freights. But this notice, as I have said, does not appear to have been' .repeated. ' Leach does not pretend that any complaints/of his conduct were subsequently made by'the' owners'; and the natural inference-is, that having confidence in Leach’s prudence and judgment, when in reply to 1his communication they were apprised by him of his determination to purchase cargoes on his. own account for the Laura; and thus insure 'constant employment for her and full freights, they were willing he should, remain and carry out his plan. And. this conclusion, is-strengthened by the circumstance that no-.measures were afterwards taken by the owners tb compel or induce him to return, and that he remained without farther complaint, engaged in these pursuits until he himself found them unprofitable, and determined to return home.
*49 .He is asked,-in one of the interrogatories:, “At what period -did the owners take efficient steps to displace you? — at any period before Captain "Weston was sent out?”. And he aüswers: “ They did not take any efficient steps, any further than to request me to come home.” And in answer to another interrogatory he says, he did not yield to their wishes, because he thought he had a, right to remain there if he chose. There was no order, therefore; no' charge of misconduct; no notice that they would put an end to the contract; nothing more than a request whieji Leach did not comply with, because he thought that while the owners suffered the contract to continue, he had a right to select the theatre of his operations, and to act upon his own judgment. And undoubtedly he was right in this respect, unless the owners' put an end to the contract, which they might have done at any moment, if they supposed him to be no longer acting in the line, of his duty. But whatever might have been their opinion as to the soundness of his judgment in selecting the Pacific instead of the Atlantic for the employment of the vessel, when they requested him to return, they undoubtedly acquiesced in his opinion when they received his answer declining to return, and continued for nearly two years afterwards to sanction his conduct, by suffering him to remain there, receiving remittances from hinjt, and paying his drafts, and settling his account, without making the slightest objection to allow him one-half 'the freights, according to the contract, for his services as master. And the charge of taking the vessel to the Pacific, and. illegally detaining her there for his own benefit and advantage, was never heard of until payment for the repairs and supplies furnished to their barque was made by the libellants. A.nd if such a defence had been founded in fact, it would have been easy for the owners to prove it conclusively by producing the correspondence between them and Leach. But ho part of- it has been offered in evidence. The fair , inference from' the testimony therefore is, that they assented to his proceedings, and approved of his remaining, after receiving his answer to the. request'for his return.
But if the ease were otherwise in this particular, and it had -been proved that Leach illegally and against their orders detained the Laura in the Pacific, I do not see how that would affect the. claim of- the libellants, unless in furnishing those supplies they knbwingly aide'd and abetted him in his breach of duly to the owners. The argument is, that they-did knowingly aid. and abét Mm. But' it woiild be a sufficient answer to it to sky, that no such charge is made against .them in the , answer; It is made against Leach; but there is not the slightest , intimation that Loring & Co. had'any 'knowledge of it. *50 ' And as this defence is not taken in the ánswer, it cannot be relied on here, even if there was evidence in the record which would justify it.
But there is not the slightest evidence to prove it. On the contrary, it appears by Leach’s testimony, that when he arrived at Valparaiso, with the cargo consigned to Loring.& Co'.', he told them upon what terms he was sailing the vessel, and the ;déép interest he had in her earnings; and thinks it probable he mentioned the contingent right he had of purchasing one-eighth of the vessel, if he could raise the money tó pay for it. The fact .that he had been trusted, with so much power over such a vessel -as the Laura, and would even be received as a partner if..he could raise -cue money, naturally induced Loring & Co. to think him worthy .of .confidence. - And they, appear to have, aided him in procuring freights, while he confined himself to that business. They evidently had no . knowledge of . any dissatisfaction on the part of the owners, for Leach states positively that nobody but himself knew of it. And when, therefore, he proposed to purchase cargoes on his own account, "which would give the Laura constant employment and full freights, they could have had no reason to suppose that his owners disapproved of it. And when these supplies were furnished, they had strong grounds for believing'that his con-, ■’duct in this respect was known to the owners, and met their ' /approbation; for they had then,seen him for nearly two years' ^engaged in .this business, during all that time in correspond<ence with his owners, and occasionálly making remittances to them, and drawing bills on. them, (as Leach . himself states,) ■which appear to have been duly honored, and without the ¡slightest token of disapproval, as far as Loring & Co. had an opportunity of seeing. There was nothing to create suspicion <or put them on inquiry. The advances made to him were añade in the regular course'-of their business, and at the usual rates, for interest and commission in that quarter of the world; ¡and they had every reason ,to believe that'they were promoting the objects and advancing the interests of the owners, as the advances made to Leach enabled him to keep the, Laura constantly employed ■ with full cargoes, thereby - earning large freights, of which the owners were entitled to the one-half. Loring & Co. had no knowledge of the state of his accounts with' the owners; and no reason even for suspecting that he, did not remit to them their share of; the freights, or that hé . improperly used or withheld it.
The case then.upon the points already examined may,be. summed up as follows: '
fsti At the. time these repairs were made'and supplies fui-, *51 nished,. Leach, was in full possession of the. barque, exercising his authority as master, under his Contract with the owners hereinbefore stated. • 2d. He was recognised and paid as'such by the owners. 3d. He was dealt with as such by Loring & Co.,, in good faith, without the slightest grounds for suspecting that .the owners disapproved of his conduct, or had requested him to bring the vessel home. 4th. The repairs and supplies were necessary to enable her to go to sea, and she must have remained idle in ‘the port if they had not been furnished; and they were made and furnished with prudence and economy, under Leach’s own direction. 5th. He had po money except the • five hundred dollars hereinbefore mentioned, which he needed for his personal expenses, and had no; funds either of his own or the owners within his reach, with which he could' make these repairs or obtain the. necessary supplies.
These facts appear to; me. to be conclusively established by Leach’s own testimony. And as it is admitted, on all hands, that the repairs were made and the supplies furnished at his request and by his order, it follows, from the decisions in this court, and at the circuits to which I have already referred, that, by the maritime code of the United States, Loring & Co. obtained an-implied lien on the vessel for the amount, unless it can be shown that they, were furnished on .the personal credit of Leach or some, other person.
.An attempt has been made to offer such proof, and to show that the supplies were furnished upon the personal credit of Leach. But it is an obvious failure. He is asked by them" whether the repairs and supplies were furnished upon his responsibility ? or the credit of the vessel? or how otherwise? He answers, “I presume'they were furnished on my responsibility.’.’ : And this is the -whole and only1 evidence offered by the appellants to .’show that they .'were mmishéd on the personal credit of Leach, and not on that of the vessel or owners. Certainly, such evidence can hardly be, sufficient to remove the implied lien given by law. Whether the credit was given to him was a .question, of fact. If the fact was só, he must have known, it, and could have sworn- to it in direct terms. But instead of this,'he merely expresses an opinion in general terms, and gives no reason for that opinion, and states no fact from which it might be inferred that this .opinion was well founded. The answer is,''in truth, no evidence; it is but the opinion or conjecture of the witness; and, even if there was, no evidence in the record to contradict it, would leave the case upon the implied lien which the law creates, v \
But it is directly in conflict with the written instruments sighed by the witness himself at the time of the transaction. *52 The account' for those repairs and supplies is headed, as I have already said, “Barque Laura and owners, to Loring & Co., Dr." It is signed by Leach, and admitted by him, in writing, to be ■correct. He of course read the account, and was undoubtedly a man of sufficient intelligence to understand the meaning of words; And how could the barque and owners be debtors for •those supplies, if they were furnished exclusively on the credit of Leach ? . How could they be debtors to Loring & Co., unless they were furnished on their credit?
It'is true, Leach < says’ he signed the account only for the purpose of verifying the items. But this is evidently an afterthought; for he admits, by his signature, not only the correctness of the items, but the account itself — that is, the charge against the barque and owners, as well as the things charged.
Besides,- if his signature was intended merely to verify the items, there waS! -no necessity for this account. . The items ought to have been inserted in the other account, sigñed by him at the same time, which contains the charges for which he was personally liable; and his admission/ of that account would have been quite sufficient, to 'verify these items. And the fact that two accounts were stated,'and signed and admitted by him bn the same day, the. one charging the repairs and supplies to the barque and owners, and the other charging him, as “Captain Phineas Leach,” for other articles properly 'chargeable to himself, .shows that both parties understood what they were about; and, to avoid future cavij, stated their accounts against the respective debtors, according to their mutual understanding at the time. And the insertion of the aggregate amount for repairs and supplies, in, the account against Leach, coupled with the account against Jhe barque and. owners; proves conclusively that the parties intended to make no special contract with Leach for those repairs and supplies, nor-to take any special hypothecation or bottomry on the vessel, but dealt with one another upon the established rules of maritime law, which, in' the absence of any special contract, made the barque and owners, and Leach himself, responsible for the amount.
: In order to give some color to his statement* that he presumes they were furnished on his credit, he says that his credit was at that time good. If he had shown that it was in fact good, it would be no reason for presuming that Loring &' Co; relied upon it, and waived the other' securities to which they were entitled. " But the record shows that it was not good, and that Loring & Co., in the advances they made to -him at the same time for the purchase of cargo on his private individual account, did’ not mink it prudent to rely altogether upon *53 .Ms credit. For tlie Reading of the invoice of the cargo purchased upon that occasion, wMeh I have already set forth, in foil, expressly required that- the sales and returns should he made, by the consignee to Loring & Co. ' And Leach admits that the cargo was tó he insured, and the loss, if any, to be paid to Loring & Co. ..And from Ms own testimony, as .well as thé invoice, it is evident that it was understood by the parties that the proceeds of the cargo were to be remitted from Panama by the consignees to Loring & Co. For hie is asked. By the libellants, “Was. there not-an understanding that the proceeds should be remitted by your consignees to Loring & Co.?” and he answers, “I don't know that there was.” But he is again pressed by. the inquiry, “"Will you reflect ánd. see if you cannot answer thát question directly that there was?” ánd he then answers, “There was no such understanding; it might be understood; there was notMng promised.” I givé the words of the witness;, but I cannot be convinced by tMs nice casuistry of Captain Leach, in distinguishing an understanding between the parties from á promise, that Ms credit was still good with Loring & Co., notwithstanding the evidence to the contrary in the agreement in the heading of the, invoice, and in the admitted agreement in relation to the insurance. It certainly does not prove it so high as to create a presumption that all other securities were waived, from their confidence in the personal responsibility of Leach; nor did his subsequent conduct show that he merited even the confidence they did repose in Mm. For he went to Panama and procured advances to. Mmself, on account of the cargo, to the amount of $2,100, and authorized large disbursements to.be, made by Ms consignee to his agent, Easton, for the use of the Laura, and proceeded to Massachusetts without returning to Valparaiso; and after'he came home, he drew on Ms consignees for $375 inore to pay Weston’s expenses, who was sent out by thq owners, and during all that time rendered no account to Lo-ring & Co., and left them, under the impression that the proceeds would in good time be remitted to. them. It seems they were not aware of the distinction which Leach took between the Mutual understanding between them and an actual and formal promise. . , o''-
The.point, therefore, taken, by the* owners, that the repairs- and supplies were furnished on the personal 'credit of Leach, . eafmot, in my judgment, be maintained. And, undoubtedly, the justice of the case is clearly with the libellants. Thé cap-tain was without funds, and his owners had none' in Valparaiso; and the barque must have remained in port a wasting hulk. if the means had not been furnished by Loring & Co., which en-* *54 abled.her to sail: The owners have since received her, and now hold her in their possession, increased in value by those, repairs, which enabled her to come home, and which were made by the money of Loring & Co. And they have also received the freights which those repairs enabled her afterwards to earn nrider the command of Weston. Justice, as well as the principles of the law, would seem to require that those who have reaped the profit of the .advances should repay the parly , to whom they áre indebted for their gains.
, It remains to inquire whether the lien has been waived, by the delay in prosecuting it, or the debt been satisfied in any other way. ...
I shall dispose of those questions very briefly. Por I am sensible that the great importance and delicacy of the points hereinbefore discussed, have compelled me to extend this discussion beyond the limits of an ordinary opinion in this'court.
; La relation to the alleged waiver by the delay, the mere statement of the evidence is an answer to the objection, and the evidence is this; The repairs were made and .the supplies fqmished in the spring of 1352.. The barque returned to Yal-paraíso in the November following, when Weston immediately assumed the command. ' He was ordered by the owners to-procure,.if he could, a cargo-of guano, and to bring the vessel to an Atlantic port. He did so; and he arrived in Baltimore in, the June following,- and the vessel was arrested , on this libel á few days after her arrival.
The barque still belongs to the same owners. When Weston arrived at Valparaiso to take the command,she had no money* and was obliged- to raise whát he . needed by a bill on, his owners. At that time, Loring & Co. had no reason to suppose that the owners would refuse to pay this claim; and. if they • had. then arrested the vessel, it would have broken up the voyage upon, which she. was destined, and subjected the owners' to' heavy losses by her detention.- • And it certainly ought not to be a matter of complaint on their part, that, under such circumstances, he did .not arrest her, and took no measures to Enforce his claim, until he1 found that, payment was refused; and it.is unnecessary to cite cases ,to prove that the omission to-'arrest her at Valparaiso under such, circumstances cannot be regarded as' a waiver of their lien, upon, any principle of law;" There was no unreasonable delay in . notifying the owners of the claim, nor in filing the libel when they disputed it. The Laura in the intervening time remained in the possession and employment of the owners; no third party had . become' interested, - and the owners .were greatly benefited *55 by the omission to arrest her until she arrived in the United ■ States. .
■ It is said that "Weston proves that nothing was said to him about their account, and hence it is inferred that nothing was due- on it, or that it was not supposed by Loring & Co. to be a. charge on the Laura. But it must be remembered that the house of Loring & Co., with whom Leach dealt, had dissolved partnership in the June preceding "Weston’s arrival, and a new one, with new partners in it, established under the same name; It .is true, that; Mr. Atherton, a partner in .the first firm, remained there, and was attending to .their business. But the transactions of Weston were with the new firm, and it would have been uséless for Atherton to present this claim .to. Weston*, unless he had'determined to libel the. vessel. Eor, as I have said,. Weston had no money but what he obtained, from the ■new house of Loring & Co.,, for his bill on his owners, and this Atherton jkn'W- • Besides, the proceeds, of her cargo shipped to Peyta and Panama, a¡s hereinbefore mentioned, at the time these repairs and supplies were furnished, were to be paid .to Loring & Co.; and when Weston was at Valparaiso, the account of these proceeds had not been received. It was most probably supposed, by Loring & Co., that they, might •prove sufficient- to pay their'claim against Leach,-including . these ‘ supplies. And this, it. appears, would have been-the case if Leach had not improperly converted a large portion-of them to his own use,’ánd to satisfy the claims of his owneirs against him. Justice, therefore, required Loring & Co. to await the result.' They did wait, and did receive some money from -this, source, but not enough "to pay even the advances for the cargo itself.
This is admitted in the argument. But It is said the money recéived should be first applied to. extinguish the lien: first,' because there was a security bound' for that item — that is, the vessel; and secondly, because -it-is the first item in the account. '
- STow, the Conclusive answer to' this objection is; that, if no specific application was made by.either party at the time of payment, the law appropriates .it according to the principles of equity.. And, as the money received from Panama was the proceeds of goods purchased with the money advanced by Lo-ring & Co. for that purpose, equity will apply it in the first place to the payment of that debt.
Indeed, there is enough, in the' invoice and the testimony of Leach to show thatthe .proceeds were to be so applied by the agreement between Leach and Loring & Co.,, when the advances were. made. And they were accordingly so applied, as’ *56 far as they would go, when the money was received by them.The fact that the'claim now in question was secured by a lien on the Laura, can surely be no reason for applying the money inrthe first place to. discharge - it. On the contrary, it would be a sufficient reason against such an application, and would be a good ground for . postponing it until ail the claims for which the creditor had no security were first satisfied.
I do not comprehend how the argument that it is the first item in the account can applyi In. point of fact, however, it is hot the first or oldest item in the account, as I understand the transaction., And, if the lien on the vessel was originally valid, it is evident that it has never been, discharged, or waived, . or forfeited by unreasonablé delay. ■
' Some other items for necessaries furnished^ at Peyta, on the last voyage of the Laura to that port, and also a small charge for bread at Valparaiso, and which are, not included in the account- signed by Leach, were allowed by the-Circuit Court, and are included in the amount decreed. These items, the counsel for the respondents insist, ought not to be allowed, even if those in the account are sustained. I think, when the .whole testimony is examined, it will be evident that these charges stand on the same principles with' those, of. which I have already spoken. But I forbear to extend this opinion- by discussing that question; because, as the court have determined that the- repairs and supplies furnished, at the request of Leaeh, are net a lien on the vessel, it is useless to examine particular- items, when the opinion of the court goes to the whole.
■ From'that opinion I respectfully dissent. And, after carefully reviewing the case in all of its bearings, and scrutinizing the evidence, -I adhere- to the opinion I held in the Circuit Court..