## THE L. B. X.

(District Court, W. D. Missouri, C. D.   March 29, 1899.)

1. MARITIME LIENS—VESSEL IN ESSE—REPAIRS.

Where, after a vessel had been launched and navigated, it was discovered that her engine was inadequate, and it became necessary to supplant it with another, the contract to furnish such new engine is a maritime contract for the repair of a vessel in esse, and hence creates a maritime lien on such vessel for the price of the engine, under Rev. St. Mo. § 770, providing that all boats shall be subject to a lien for repairs, and admiralty rule 12, permitting suits in rem by material men for supplies or repairs, etc., against the ship.

2. SAME—REPAIRS TO BE COMPLETED ON LAND.

Where a new engine was specially manufactured at libelant's factory for a vessel then in port, to which it was shipped on completion, and it was agreed that the libelant should retain title in the engine until it had been set up, and found to work satisfactorily, the delivery was not complete until after the engine had been placed and operated on the vessel, and hence was not a contract for repairs to be completed on land, so as to prevent the attachment of a maritime lien therefor.

3. SAME—WAIVER.

The owner of a vessel, on contracting for repairs, agreed to pay cash on delivery, but thereafter, being unable to do so, agreed that libelant should have a lien on the repairs and vessel for the same. After the repairs had been delivered, the owner refused to give notes in form agreed, and thereupon libelant objected to the note offered, and offered to return it, and waive security on the vessel, if the owner would divide the payments as requested, to which no reply was made. Held not to constitute a waiver of libelant's maritime lien on the vessel.

4. SAME—BURDEN OF PROOF.

Since a maritime lien for repairs attaches to the vessel by operation of law, the burden is on the one claiming a waiver thereof to show affirmatively that the lien was waived as part of the contract.

5. SAME—NOTES TAKEN IN PAYMENT.

The mere giving of notes in payment of repairs on a vessel does not of itself create a waiver of the contractor's maritime lien therefor. The notes not being paid, he may return them, and enforce his lien.

6. SAME—EQUITABLE MORTGAGE.

The lien was not lost by the acceptance of a note containing a provision rendering it an equitable chattel mortgage.

Wash Adams and Charles B. Adams, for libelant.
S. D. Chamberlin and Edward L. King, for claimant.

PHILIPS, District Judge.   This is an action in admiralty for the enforcement of a maritime lien on the defendant stern-wheel boat, navigating the Missouri river in this district, for an alleged repairing of said boat by libelant with a 38 horse power gasoline engine, with necessary fixtures and appurtenances for operating same on said boat. One Henry Strutman, who claims to be the master and owner of said boat, interposed as claimant. The answer admits the furnishing of the engine and appurtenances by the libelant, but claims (1) that the engine, etc., was not for furnishings made, or repairs, for said boat, but the same was for the equipment of a vessel, either not yet completed, or, if completed, was simply a substitute for another engine on the vessel, and the new engine was not, therefore, a necessary repair within the purview of a maritime lien;  and (2) that by special contract or

agreement between the contracting parties a maritime lien was waived. The court referred the matter to John Montgomery, Jr., Esq., as commissioner, to take the evidence, and report the same, with his findings and conclusions, to the court. His report having been filed herein, finding the issues for the libelant, the claimant has filed exceptions thereto, which have been heard, and submitted to the court. The commissioner has found the fact to be that this steamboat had been engaged for some months prior to the negotiations between the parties for the engine in question in navigating the Missouri river; that it was first equipped with an engine which proved to be inadequate and insufficient to accomplish the work in which the vessel was engaged; and, therefore, it was necessary, in the opinion of the master and owner of the vessel, that the engine in use should be entirely removed, and one of libelant's manufacture should be substituted therefor. The contention that, to constitute a repair within the meaning of the law, it must be for some alteration, improvement upon, or rearrangement of an existing structure on the vessel, is not supported either by reason or established authority. This vessel having theretofore been launched, and actually engaged in navigation, the material furnished was not for the original construction of the vessel; in other words, it was not furnished under a contract to create a new boat.

"But whatever is done to or about an existing ship has a direct reference to commerce and navigation. A ship in esse as a maritime subject gives a maritime character to all transactions connected directly with it. The cases are distinguishable thus: One class founded upon contracts for repairing and rebuilding of vessels, all such contracts to be maritime, because they affect vessels in esse; the other class, founded upon contracts for the building of proposed vessels, hold such contracts to be nonmaritime, because they touch maritime subjects only by relation to proposed vessels, the future existence of which is contingent upon the performance of the terms of the contract in each case." The Manhattan, 46 Fed. 797.

As said in The Eliza Ladd, 3 Sawy. 519, 523, Fed. Cas. No. 4,364:

"A contract, made after a vessel is launched and afloat, to furnish her with a particular means of propulsion,—as sails or steam paddles,—or to change the mode of her propulsion, is a maritime contract. Certainly it is not a contract to be performed on land. Neither is it a contract to build, any more than any contract for repairs."

A water pump furnished to a water craft used for pumping out a dry dock has been held to be for maritime service, for which a lien in admiralty may be enforced. Winslow v. A Floating Steam Pump, 2 N. J. Law J. 124, Fed. Cas. No. 17,880. Likewise casts furnished for a foreign vessel are materials for which a lien obtains. Zane v. The President, 4 Wash. 454, Fed. Cas. No. 18,201.

It is suggested in argument, but not specifically pleaded, that no maritime lien obtains in this case for the further reason that the repairs in question, if any, were made on land, and not on the vessel. The facts are, as found by the commissioner, that the steamboat was in port at Jefferson City; and the libelant had its factory at Kansas City, Mo., where the engine and appurtenances were manufactured under contract especially for this vessel. When completed it was to be shipped f. o. b. to the claim-

ant at Jefferson City, to be placed by him on the vessel at that port. But this is not all. By reason of claimant's failure to comply with the terms of his contract with libelant in paying for the engine when ready to be placed upon the vessel, upon his further insistence it was further agreed between them that the engine should be put in place upon the vessel, the libelant retaining temporary title thereto until the claimant could test the engine in the operation of the vessel; and, if it proved satisfactory, it was to be finally received and 'paid for by him. And it was accordingly so placed upon the vessel, and tested to the satisfaction of the claimant. Therefore, from claimant's standpoint of view, the delivery was not completed until the engine was finally put in place and operated for some time upon the vessel. Under such circumstances it would be to allow the claimant to take advantage of his own default and wrong, after thus insisting upon making a test in the actual working of the engine on his vessel, to hold that this was a contract to be wholly completed on land. Nor, under such circumstances, can it in law or morals affect the material man's lien that the contract contemplated that the master of the vessel should receive and place the engine in position on the vessel, as this arrangement pertained rather to the matter of the cost of repair than to the right to a maritime lien. The statute of this state (Rev. St. § 770) expressly declares that "every boat or vessel, etc., used in navigating the waters of this state shall be liable and subject to a lien in the following cases: In the building, repairing, etc., thereof." The twelfth admiralty rule provides that "in all suits by material men for supplies or repairs or other necessaries, the libelant may proceed against the ship, etc., in rem, or against the master or owner alone in personam." When this is viewed in connection with the rule as originally adopted in 1844, it shows the purpose to give the material man a lien for all supplies or repairs, with or without the existence of a local law giving such lien.

2. The persistent contention of claimant to avoid the enforcement of a lien upon his vessel for this essential equipment of the vessel after it entered upon navigation, to enable it to accomplish its required propulsion, is as reprehensible in morals as it is unfounded in fact and law. A brief reference to the negotiations between these parties leading up to the obtaining possession of the engine and its equipments can leave no doubt in any fair and unprejudiced mind that this claimant deceitfully and cunningly intended from the outset to obtain possession of this engine without paying for it. The negotiations began in the fall of 1896, by correspondence between the claimant and libelant. In his letters the claimant stated that his boat had been upon the river for some time, and the engine in use thereon was insufficient, and he wished to obtain one of the libelant's manufacture. The price first demanded by libelant for the engine and appurtenances was $1,200. This demand was not acceded to by the claimant. Later, during the winter of 1896–97, the claimant visited Kansas City, when, by verbal negotiations between them, the kind and quality of engine desired by claimant was agreed upon; and,

in consideration of a cash payment to be made therefor on the delivery of the engine and material at Jefferson City, f. o. b., the libelant agreed to take $900, and the claimant assented thereto. He stated, both in his correspondence and in his conversation with the libelant, that he could secure the payment of the contract price by giving certain of his relatives as sureties, and, finally, that through their assistance he could obtain the whole of the purchase money therefor; and the minds of the parties met upon the proposition that the libelant would proceed with the manufacture of the engine, with its appurtenances, and that the claimant would deposit the $900 with the Merchants' Bank of Jefferson City, Mo., to be paid over to the libelant upon the delivery of the engine, etc. After this the claimant, by letter, objected to some part of the equipment to be furnished by libelant, and insisted upon the substitution of something else, which the libelant claimed would materially add to the expense of construction; but this change was ultimately conceded by the libelant, to end the controversy. About the time the construction of the engine and equipments were completed and the claimant was notified of its readiness for delivery, the claimant wrote to libelant to delay delivery for a few days on account of ice in the river obstructing navigation, and because he wanted "a couple of days on the money now out," but requesting him to ship the "pulley and clutch," which was part of the machinery, and also the pump. With this request libelant complied, replying that the engine was ready for shipment, and it would ship just as soon as it received from said bank a letter advising it of the money being on deposit, as agreed upon. Nothing more was heard from the claimant until about a week thereafter,— February 17, 1897,—when he wrote that his son-in-law had failed to sell property as expected, and he had failed to obtain the money; and then began to talk about giving security for the money. To this libelant replied, expressing surprise at the news of the failure to have the money ready, and asked the claimant how much time he wanted, and how much cash he could pay down; and inquired, if his father and the security he spoke of were good, why he did not obtain the money from the banks. After waiting a week without hearing from the claimant, the libelant wrote him again, saying that it had not heard from him, and that the engine was ready and waiting. After the lapse of another week the claimant wrote: "I ain't got the money yet. Let us go partners in the boat;" and, further, that he would be able in two or three months "to buy you out again"; that there was no money to be had at local banks. He again adverted in this letter to his father and his son-in-law, stating that he was greatly needing the engine, and that he was losing business by not being able to get started with his boat, and offering to pay if he got the money; and as evidence of the fact of the absolute necessity of this engine to his boat he used this language: "I know you are disappointed, but not as bad as I am. You can sell your engine, but I can't sell my boat without an engine." After another delay he wrote that he had $400 which he could pay; but not to send the engine until he saw the custom officers, to know what changes he would have to make in the registry of his boat. After some correspondence respecting this mat-

ter, and further delay, he wrote that he had only $300, and offering to give his note with 6 per cent. interest, and the "engine for security"; and that he would pay as fast as he got the money. To properly appreciate and understand this proposition to give the engine for security, it is well to revert to the fact found by the commissioner, and sustained by the weight of the evidence, that in the interviews between the parties at Kansas City in the winter preceding it was then understood between them that for any deferred payments of the purchase money the libelant was to have a lien upon both the engine and the boat. To the last-named letter from claimant the libelant replied, noting the offer to pay $300, and for time, etc., reminding him that the contract was strictly for cash, and therefore the price was low, but was willing to try and help him out in the matter, and asked him by return mail to say how much time he wanted on the balance, suggesting that if he could make it in 2, 3, 4, 5, and 6 months, divided up to suit himself, it would be satisfactory; "but if we sell on time we ask that you remit us draft for first payment. As soon as this is received we will ship engine; and when it is set up and running on your boat you are to make us the notes, making payments inside of six months, and with 8 per cent. interest instead of 6, as we are obliged to pay eight per cent. here for our money." This letter was dated March 18, 1897. Instead of meeting this proposition, the claimant seems to have called to his assistance a lawyer, who wrote for him on the 19th of March, stating that he (Strutman) "desires me to say—and I know the fact to be—that he has $300.00 in bank for you. He is willing to pay you this money when the engine in satisfactory condition is delivered f. o. b. to him here. He will give you time notes, as you suggest, at eight per cent. for the balance of the $600.00." Libelant telegraphed on the 20th: "Will ship as per letter of 18th. Answer promptly." On this day claimant telegraphed the libelant: "You money ready here if engine satisfactory. If it will not work, consider deal off." Thus it is made manifest that the claimant did not accede unconditionally to even the last proposition made him by the libelant to settle this matter; but began to impose other conditions, such as that the engine must be satisfactory, and if "it will not work, consider deal off." After this, on the 22d, he telegraphed libelant: "Send as per my attorney's letter; money ready." The engine was shipped to Jefferson City, and the bill of lading was sent to said bank with the notes to be executed by the claimant, bearing date of March 24, 1897, with a lien reserved therein on the boat. Instead of claimant complying with the modified arrangement, his attorney wrote on the 27th of March, stating that the bill of lading for the engine had been received by the bank, and "that you demand the $300.00 and $600.00 in notes before he (Strutman) gets the engine, or has a chance to examine and try it. His agreement was to pay $300.00 down upon delivery; * * * and he would give you the notes as soon as he had a chance to try the engine,— it proving satisfactory." The letter then further naively suggested that the engine, under the law, was subject to be taken for the purchase money; and further suggesting that a bill of sale could

be given by Strutman for the engine before making the notes, to be released on making the notes. So, again, did the claimant fail to comply with the terms of his own proposition by declining to give the notes, or any notes at all, and imposing the additional condition that he was to take the engine and test it on the boat before either paying the money or giving the notes.

As by claimant's repeated receding from proposition after proposition, and cunning jugglery, he had gotten the engine delivered at Jefferson City, so that the libelant was much at his mercy, the libelant wrote said lawyer on the 29th of March, consenting that on the payment of the $300 down, and giving the bank the bill of sale for the engine, conditioned upon the release when the notes were signed, Strutman could take the engine, set it up on the boat, and test it, "and within two weeks sign the notes for the balance." The $300 was afterwards paid, but the notes were not given in any form at that time. Strutman and his lawyer afterwards, on the 27th day of April, 1897, induced said bank to take from Strutman a single note for the balance of the purchase money, $565.03, payable to libelant October 27, 1897, the consideration of which was expressed to be for one No. 9 Weber gasoline engine, with appurtenances, sold and conveyed by Strutman to libelant, with a condition something after the character of a chattel mortgage, to be discharged upon the payment of said sum of money. There is no pretense of authority from libelant to said bank to take such a note. The agent of the bank who had this matter in charge for libelant testified that it was not the note authorized to be taken, and when it was forwarded to the libelant it immediately, on April 29, 1897, returned the same to the bank, and wrote Mr. Strutman, advising him of its return, and stating that it was not in accordance with the agreement in any respect; that he was to pay the balance on the engine within six months after the engine was shipped, and therefore the notes should bear interest from the 24th of March; and further reminding the claimant of his agreement to give security by a lien on both the engine and the boat, and requesting him to go to the bank and give a note of date March 24, 1897, covering both the engine and the boat. This the claimant failed and refused to do; and again, on the 5th of May, 1897, libelant wrote the claimant, complaining of his refusal, and reminding him of his promise during the negotiations to give a mortgage on the engine and the boat. The answer to this from Strutman came on May the 18th, in which, without at all denying the statement in the letter to him about his promises, he simply said that he was working "to make money with the intention to pay for the engine to keep from paying eight per cent." To this claimant replied on the 22d of May, 1897, upbraiding him for not keeping his promises, and advising him that libelant had written to the bank that, if the claimant did not want to give the boat as security, if he would divide up the payments, one-third in two months, one-third in four months, and one-third in six months, it would waive the security on the boat. To this claimant made no reply, nor did he go to the bank and make the notes accordingly;

but on the 25th of June he wrote the libelant without saying a word about the settlement of the contract, but only in commendation of the efficiency of the engine, and promising to pay "a nice chunk of money on or immediately after pay day, July 5th." No payment was made, however, until August 2d following, of $102. From all of which it is apparent that the libelant never consented to waive his maritime lien except upon conditions with which the claimant never complied; and therefore the implied lien which the law gives remained in force. Rubber Co. v. Ohrndorf, 29 C. C. A. 188, 85 Fed. 348–353.

Counsel for claimant presents his case as if it devolved upon the libelant to show a specific agreement between the parties that a lien upon the boat should be retained. The law gave the lien absolutely; and, therefore, it devolved upon the claimant to show affirmatively that this lien was waived as a part of the contract. No unprejudiced mind can read the correspondence and the testimony of the parties without being persuaded that it never was the intention of the libelant to waive his right to security upon the boat except upon the condition either of a cash payment, which was originally agreed upon, or the giving of personal security; or, finally, when driven to it by the bad faith and sharp practice of the claimant in getting the engine delivered at Jefferson City, and his refusal to do anything except upon his own terms, libelant proposed to waive the security on the boat if the claimant would make certain notes, which he never made, and if he would make certain payments, which he never made. Had the claimant paid the $300 and given notes for the balance, that of itself would not have amounted to a waiver of the lien. "The notes being unpaid, he may return them, and enforce his lien." The Kimball, 3 Wall. 37. This is precisely what the libelant did with the note of April 27, 1897, delivered to the bank by claimant; the return of which is again offered at this trial. Even if the note of April 27, 1897, were construed as an equitable chattel mortgage, and even if it had been accepted by the libelant, as the mortgage is but an incident of the note, that of itself was not sufficient to waive the maritime lien. The D. B. Steelman, 48 Fed. 580. And what adds conclusiveness against the contention of claimant is the fact that the letter of his counsel, suggesting the matter of the bill of sale of the engine, conveyed the idea that this was only a temporary arrangement for the protection of the libelant while the engine was being tested on the boat, to end when the test was satisfactory. And even then he did not give such bill of sale on taking the engine and putting it up, but a month later, allowing himself six months from the 27th day of April, 1897, in which to pay, instead of six months from the date of delivery of the engine, to which libelant refused to accede. The result of all of these maneuvers of the claimant is that for two years he has had the use of the engine, without paying therefor, during which he has, by his meritless litigation, piled up costs equal to the original debt. He, with a show of virtue, offers to allow judgment in personam for the balance due on the contract; but this loses its flavor of fairness in the

fact that he knows such judgment would bear no fruit for his creditor. The exceptions to the commissioner's report are over-ruled, and decree ordered for the libelant.