## THE GURNET.

(District Court, D. Maine. July 31, 1916.)

### No. 324.

1. MARITIME LIENS ⬥57—LIEN GIVEN BY STATE STATUTE—ENFORCEMENT IN ADMIRALTY COURT—"LABOR OR MATERIALS FURNISHED FOR BUILDING A VESSEL."

Rev. St. Me. c. 93, § 8, provides that whoever furnishes labor or materials for building a vessel shall have a lien on it therefor, which may be enforced within four days after the vessel is launched, or, if furnished under a contract not then completed, within four days after its completion. Intervener was employed by contract to furnish and install the

engine and machinery of a steamer being built, and during performance of the contract was directed by the superintendent of the work for the owner to furnish and install a pinch wheel for the engine and a spring bearing for the shaft; the engine and shaft being secondhand and without such appliances. These parts were not completed when the vessel was put into service, but were installed afterwards, and within four days before the steamer was seized in a suit to enforce liens. *Held*, that the work done by intervener was such as contemplated by the statute and entitled him to a lien; that the admiralty court, having taken possession of the vessel before the time for enforcing the lien had expired and sold the same, had jurisdiction to entertain and determine all claims against the proceeds, and would enforce intervener's lien, although a different procedure was prescribed by the state statute.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 96; Dec. Dig. ☞57.]

2. MARITIME LIENS ☞43—WAIVER—TAKING OF NOTES.

Claimant, while performing a contract to furnish work and materials for the building of a vessel, for which on completion he would be entitled to a lien under the state statute, took notes from the owner for a part of his claim. He did not intend to abandon his lien, or understand that it would be affected; but the purpose of the parties was to enable him to raise money temporarily until the owner could arrange for payment. After two or three days, finding he could not use the notes, they were returned. *Held*, that claimant did not lose his lien, and that it was entitled to priority over a mortgage on the vessel and over the trustee in bankruptcy of the owner.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 82; Dec. Dig. ☞43.]

In Admiralty. Suit by Randall & McAllister against the steamer Gurnet. In the matter of the claim of Joseph C. Noyes, intervener. Decree for intervener.

Benjamin Thompson, of Portland, Me., for intervener.

William S. Linnell, of Portland, Me., for trustee in bankruptcy of Portland-Bath-Casco Bay Rapid Transit Co.

HALE, District Judge. On September 18, 1914, the steamer Gurnet was seized upon this libel to enforce a maritime lien. On November 12, 1914, she was sold at a marshal's sale by virtue of an interlocutory order of sale, and the proceeds of the sale were paid into the registry of this court. On the day of filing the libel, Joseph C. Noyes intervened, by petition, to enforce a lien for labor and materials furnished for installing the boiler and machinery of the steamer. It is alleged that this lien is a construction lien, and arises under section 8 of chapter 93 of the Revised Statutes of Maine, as follows:

"Sec. 8. Whoever furnishes labor or materials for building a vessel, has a lien on it therefor, which may be enforced by attachment thereof, within four days after it is launched; but if the labor and materials have been so furnished by virtue of a contract not fully completed at the time of the launching of the vessel, the lien may be enforced within four days after such contract has been completed. * * * *"

The proofs show that the labor and materials were furnished by the intervener, Noyes, for the installation of a pinch wheel, an appliance for turning the engine over, and a spring bearing.

It is contended on behalf of the trustee in bankruptcy that Noyes was to install the engine, not as a contract job, but that he was to be paid a fair value for the material furnished, and for the labor by the day; that the steamer entered into the service for which she was built on July 9, 1914; that the constructive work was completed at that time, and that Noyes did not enforce his claim to a lien within four days afterwards, and that, therefore, he has lost his lien; that the appliances furnished were not necessary for the working of the engine, or for the operation of the boat but that the steamer could, and did, operate without them; that inasmuch as the contract was not completed before the vessel went into service, no enforceable lien ever attached to the steamer; that, even though Noyes may have had an uncompleted contract during the summer of 1914, during that period he had only an inchoate right to a lien under certain conditions; that such right could not be enforced, under the terms of the statute, until he had completed his contract and established his lien; that, in any event, it could not be enforced at any other time than "within four days after such contract has been completed," as provided by the statute; that, under the statute, when labor and materials are furnished, in accordance with the terms of the contract, nothing but the completion of the contract can create a valid lien, and that, up to the time of the completion of the contract, there exists only an inchoate right to a lien; that such right is given, not by a federal statute, but by a state law; and that neither the federal court nor any other court can enforce a right that does not comply with the terms of the state statute.

[1] 1. It becomes necessary to examine the proofs to see what the contract was between the parties. The steamer Gurnet was owned by the Portland-Bath-Casco Bay Rapid Transit Company, a corporation organized in November, 1913, to carry on a passenger and freight business. Captain Oscar Randall was a director and the president; George W. Brown was the general manager and treasurer. Captain Oscar Randall had followed the sea for more than 30 years as master of sailing vessels and motorboats. He is well known to me as being experienced in maritime matters. Mr. Brown, at the time he went into this business, had no experience in maritime affairs. Captain Randall testifies that while Brown was the general manager, he himself made the contract for the building of the Gurnet, after consulting Brown; that his understanding was that Brown was to consult with him, as a director, in making the contracts and giving directions as to what should be done, and that he himself should have the superintendence of the boats. Captain Randall says that both he and Brown entered into a contract with Mr. Noyes. Brown himself testifies that it was understood that Noyes was to furnish everything necessary, with the exception of the feed water heater, boiler, condenser, and pump, and some incidentals, and that Noyes was given orders to furnish everything else necessary to install and fix up the boat. He adds:

"I considered that we had entered into an agreement with him [Noyes], and that he was to complete the work unless there was some unusual proceeding; but I had every confidence in Mr. Noyes doing the work right."

It appears that one Ray Marshall was appointed to superintend the work of installing the machinery for the Gurnet. The proofs lead me to believe that, during the process of installation, it was discovered that the engine, a secondhand one, did not have a pinch wheel upon it, or any other appliance for turning it over; that the shaft was also a secondhand one, with heavy couplings; that no spring bearing was connected with it; that on or about June 19, 1914, Marshall, then acting as superintendent of installation in behalf of the vessel, ordered Noyes to prepare a pinch wheel and spring bearing which were necessary for the operation of the steamer and that he determined where the pinch wheel should be located; that, under Marshall's directions, Noyes made measurements for the purpose of determining the size of the pinch wheel, and that the shaft was prepared, before it was put into the steamer, for the reception of the spring bearing; that Noyes received orders from the superintendent of construction to make these two parts, with the agreement that they should be installed as soon as the steamer could be hauled up long enough to perform the work to be done; that at the time of the installation of the steamer's machinery Noyes was compelled to put off the work of preparing the parts and construction of the pinch wheel and spring bearing, and, it being necessary that there should be some means of turning over the engine, it was agreed that, while these appliances were being prepared, Noyes was to loan Marshall, for the temporary use of the steamer, a large Stillson wrench; that the installation of the pinch wheel and spring bearing was not completed when the vessel was put into service, July 9, 1914, but it was understood that Noyes should do the work on the pinch wheel and spring bearing when it was convenient for him; that the pinch wheel was duly installed and the spring bearing delivered on board the steamer, under the contract, on September 15, 1914, within four days before these proceedings were commenced.

Without further reciting testimony, after a full examination of the proofs, I am satisfied that the contract was one relating to the construction of the vessel; that within the meaning of the state statute, the labor and materials were furnished for "building a vessel"; that the pinch wheel and spring bearing were necessary parts of the steamer, and were furnished upon the order of the owner of the steamer, by its superintendent of construction, under one continuing contract; and the fact that some time intervened between the time the steamer was put in operation and the time when the pinch wheel and spring bearing were furnished does not affect the validity or priority of the lien.

The jurisdiction of the court over the lien is fixed by the fact that the steamer was seized and sold under admiralty proceedings; the court thereby acquiring jurisdiction over the remnants of the sale in the registry. It has long been well settled in the admiralty courts, that, where proceeds are rightfully in the possession and custody of the admiralty, it is an inherent incident to the jurisdiction of the court to entertain supplemental suits by the parties in interest to ascertain to whom the proceeds rightfully belong; and, although the state statutes prescribing liens prescribe also the forms of proceedings, still the federal courts proceed to give relief in admiralty, sometimes by sum-

mary proceedings of a character entirely different from those provided by the state statute. Andrews v. Wall, 3 How. 568, 573, 11 L. Ed. 729; The Lottawanna, 21 Wall. 558, 582, 22 L. Ed. 654; Schuchardt v. Babbage, 19 How. 239, 241, 15 L. Ed. 625; The Atlantic City (C. C.) 220 Fed. 281; Berwind-White Coal Mining Co. v. Metropolitan S. S. Co. (C. C.) 166 Fed. 782.

Under the practice of maritime courts I can have no doubt that this court has the right to distribute this fund.

Under the proofs, I think the lien established is of the positive character I have above indicated; but, even if the testimony disclosed only an inchoate lien, it would still be the duty of the court to give effect to such lien, and to provide means for enforcing it. In the Metropolitan Steamship Case (C. C.) 166 Fed. 782, 785, to which I have referred, Judge Putnam says:

"If, at the time the bills before us were filed, there was resting on those steamers, or either of them, an inchoate lien of any character, it is the duty of this court to give it fruition."

Under the practice of the admiralty courts, whatever right Noyes had in the steamer at the time possession was taken under the process issued by this court in this proceeding, it is the duty of the court to protect and enforce such right, and "to give such remedy as the equity of the case might advise."

[2] 2. The proofs show that, on July 28, 1914, the manager of the Portland-Bath-Casco Bay Rapid Transit Company gave Noyes four notes, two for $400 each, and two for $300 each; that one, at least, of these notes was on four months' time, and would mature on or about November 27, 1914. The notes were returned after two or three days. There is contradictory testimony touching the matter of the taking and returning of the notes. The learned proctor for the trustee urges with clearness and force that, in taking the notes, Noyes extended credit to the owners of the steamer for four months as to a part of the indebtedness, and that it is apparent that Noyes, at the time he took the notes and at the time he so extended credit, knew that his contract would be completed before the expiration of the term of credit; that, by the law of Maine and of Massachusetts, the acceptance of notes by a creditor is presumed to be in payment of the debt (Wilkins v. Reed, 6 Me. 220, 19 Am. Dec. 211; Spitz v. Morse, 104 Me. 447, 72 Atl. 178, and cases cited); that by the law of the federal courts if a creditor extended credit beyond a period when, by the terms of the statute, he must enforce his lien, then his lien is lost, because, by subsequent contract, he has entered into an agreement inconsistent with the enforcement of his lien. The learned proctor cites the leading federal case, Westinghouse Air Brake Co. v. Kansas City Southern Ry. Co., 137 Fed. 26, 71 C. C. A. 1, where the Circuit Court of Appeals for the Eighth Circuit held that the acceptance for a debt, secured by a lien, of a promissory note which does not mature until after the time fixed by the statute for the commencement of an action to enforce the lien destroys the lien, for the reason that the acceptance of the note extends the time of payment of the debt until the note matures; and the learned proctor for the trustee

urges that, whatever contract Noyes had made, it would have been completed long before the expiration of the term of credit he extended to the owner of the steamer by taking the notes; and the learned proctor denies that Noyes ever returned the notes under such circumstances as to make a mutual rescission of the contract, and that any repudiation of the contract by Mr. Noyes could not affect the contract previously made, for either he would still be liable under that contract or liable for damages for repudiation; that the lien was absolutely destroyed by Noyes' intent to extend credit for the period of four months, and, the lien being destroyed, it could never be restored or reinstated by any subsequent act.

It is necessary here to carefully examine the proofs in relation to the receipt of the notes. Noyes testifies that, on July 28th, Brown, the manager of the company owning the steamer, gave him the four notes in question, and one of the notes, at least, was on four months' time; that he took the notes to the Canal Bank, and he thinks they were placed to his credit, but he does not think he drew against them. As a result of conference with his counsel, Noyes obtained the notes from the bank within two or three days. He went to Brown's office again, and handed him the four notes, and stated that he could not use them, as they were not acceptable to the bank, so he returned them to Brown. Noyes says that Brown made no objection to the return of the notes, and did not give question to Noyes' right to do so, and that the notes have been in Brown's possession, so far as he knows, ever since that time, and were in the possession of the trustee in bankruptcy at the time of the hearing. The notes did not cover his account in full, and, when he returned them, Brown did not return his account. Noyes testifies clearly that "his object in taking the notes was simply to help him out until the steamboat company could raise money"; that he thought, at the time of taking the notes, he had a maritime lien, but he did not know the difference between a construction lien and a maritime lien; that in taking the notes he did not intend to waive or discharge his lien, and he did not understand that the giving or taking of notes would affect his lien, but the bank asked him to look into the question of lien; and he then consulted his counsel; that soon after he returned the notes he asked Brown for money, Captain Randall being present, and told Brown that he had been informed by his counsel that his lien would continue four days after the completion of his work, and that things would have to be settled up; that both Brown and Randall stated that they did not want to do anything to hurt him; that he had done the work in a satisfactory way and should have his pay; that, a few days after he returned the notes, he told them that he had not completed his work, and should want to take action within four days after he had completed it; that they asked him to hold off on the work for a few days, to see if they could not make some arrangement to raise the money. In his testimony Captain Randall does not contradict Noyes on any material matter. Brown's evidence is contradictory to Captain Randall's in many important particulars; it is not necessary to discuss that testimony, or that of other witnesses, in detail. On all the proofs, I am satisfied

that the taking of the notes by Noyes was on condition that they would be accepted by the bank; that the notes were given, and received only as a temporary expedient, with a view to giving the company owning the steamer an opportunity to negotiate loans with which to meet its obligations, and, at the same time, to assist Noyes in raising money; that the notes did not cover the full amount of the account, and were not, in fact, given in settlement of the account; and that, in giving and taking the notes, both Captain Randall and Mr. Noyes understood that Noyes retained his lien on the steamer, and that there was no intention, on the part of either, that the taking of the notes should operate to waive the lien existing at that time.

In The Helen M. Pierce, Fed. Cas. No. 6,332, Judge Fox, in this district, refers to Carter v. The Byzantium, Fed. Cas. No. 2,473, in which, in speaking of the rule of Maine and Massachusetts courts, Judge Clifford says:

"It is merely a presumption of fact, and may be controlled by circumstances indicating a contrary intention."

In The Alabama (C. C.) 22 Fed. 449, it was held that, by the principles of the maritime law, a lien is not lost by the acceptance of notes, unless the claimant can show that the lienholder agreed to receive the notes in lieu of the original claim. In The L. B. X (D. C.) 93 Fed. 233, 239, in commenting upon a case where it is claimed that taking a note had waived a lien in the admiralty court, District Judge Philips said:

"The law gave the lien absolutely, and therefore it devolved upon the claimant to show affirmatively that this lien was waived as a part of the contract. * * * 'The notes being unpaid, he may return them, and enforce his lien.'" —citing The Kimball, 3 Wall. 37, 18 L. Ed. 50.

In Robins Dry Dock & Repair Co. v. Chesbrough, 216 Fed. 121, 125, 132 C. C. A. 365, 369, in speaking for the Court of Appeals for this Circuit, Judge Putnam said:

"It is settled, however, by sound reason, and by long practice and acquiescence, that any debt to which a lien or a special ground of relief is attached is not discharged, so far as the lien or special ground of relief is concerned, by a renewal, or any number of renewals, unless there is something of a peculiar nature which showed that what was done was intended to absolutely merge the original debt. * * * Independently of the question of the effect of taking a promissory note, which in Massachusetts and Maine is regarded as a discharge of the original debt prima facie, while in New York it is not regarded as such a discharge, the rule is universally applicable, for example, that the taking of a new obligation does not necessarily discharge the original debt without an especial intention on the part of the parties that it should do so."

See Meyer v. Tupper, 1 Black, 522, 525, 17 L. Ed. 180; Ramsey v. Allegre, 12 Wheat. 611, 6 L. Ed. 746; The Winnebago, 141 Fed. 945, 946, 73 C. C. A. 295; The Pioneer (D. C.) 53 Fed. 279; Moore v. Newbury, Fed. Cas. No. 9,772; The Sarah J. Weed, Fed. Cas. No. 12,350; Page v. Hubbard, Fed. Cas. No. 10,663; Hudson v. Bradley, Fed. Cas. No. 6,833; The Napoleon, Fed. Cas. No. 10,011. The Eclipse, Fed. Cas. No. 4,268.

In the case at bar the proofs lead me to believe that the notes were not taken with the intention that Noyes should abandon his lien. They lead me to distinctly the opposite conclusion, namely: that, at the time of taking the notes, Noyes supposed he had a lien, and did not intend to waive or discharge it and did not understand that the giving or taking of notes would affect his lien. The return of the notes followed in a few days, under circumstances tending to substantiate the contention of Noyes. In view of all the testimony, and of the decisions of the federal courts I am constrained to find that Noyes' lien was not lost by the action of the parties in reference to the notes. As bearing upon his intention, it is clear that Noyes would never have taken the notes if he had been fully advised of the financial condition of the company, and of Brown and Randall. It is obviously true of him, as it was of the claimant in The Helen M. Pierce, Fed. Cas. No. 6,332, of whom Judge Fox said:

"In my opinion, Coombs did not intend to release and discharge his security by thus accepting Maddocks' note; and it is certain he would never have done it, if fully advised of Maddocks' condition."

There is no necessity of reviewing in detail the testimony touching the claims of the mortgagee. Under the proofs, and under the decisions of the federal courts, it is clear that the construction lien of Noyes takes priority over the mortgage, as it does over the trustee in bankruptcy. American Trust Co. v. Fletcher Co., 173 Fed. 471, 479, 97 C. C. A. 477; The Kiersage, Fed. Cas. No. 7,762; The St. Joseph, Fed. Cas. No. 12,229; The Guiding Star (D. C.) 9 Fed. 521, 524.

I find, then, that the work done by the intervener, Noyes, was done as a part of the work growing out of the construction of the steamer Gurnet; that the pinch wheel and spring bearing were furnished on the order given by the superintendent of construction of the steamship company, soon after the work of installation began; that the fact that some time intervened between the steamer's being put in operation and the time the pinch wheel was installed and the spring bearing delivered on board the steamer does not affect the validity or priority of the lien; that the intervener's construction lien was not rendered invalid by the taking of the notes; that the notes were not received with any intent of discharging the lien; that the intervener's lien takes priority over mortgages and also the rights of the trustee in bankruptcy.

There must, then, be a decree for the intervener, Joseph C. Noyes, for the sum of $1,597.26, with interest to March 1, 1916, with costs, and that the claim constituted a lien upon the steamer Gurnet at the time she was seized by the marshal, by virtue of the process of this court, issued in this case, and that such lien is entitled to priority over the rights of the trustee in bankruptcy and over the mortgage. Let such a decree be drawn and presented.